[Crim. No. 17309. Second Dist., Div. Five. Mar. 27, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID MOSES, Defendant and Appellant.

**COUNSEL**

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Blanche C. Bersch, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**REPPY, J.**—After this division had rendered an opinion in this case, the Supreme Court granted a hearing. It has transferred the matter to us. We have revised the segment of our opinion pertaining to impeachment by proof of prior conviction of a felony, in light of *People* v. *Beagle,* 6 Cal.3d 441, 451-454 [99 Cal.Rptr. 313, 492 P.2d 1], which was handed down during the intervening period. Otherwise, on this transfer, we reiterate our original opinion.

In November 1968 David Allen Smith (Smith), an undercover officer having experience as such with the Bakersfield Police Department and the State Narcotics Bureau, was under contract to the City of Pomona during a so-called "buy program" which had started about the 1st of September and was to run to the end of December 1968.

On Friday, November 22, 1968, Smith indicated to his superiors that he believed he could make a buy at the Broadside Bar. The inference to be gained from the record is that the buy would be from a man whose identity and name (Dave) and inclination to sell had been made known to Smith. Smith was authorized to proceed and was furnished $10 in city money.

At about 10 p.m. on the 22d, in pursuit of the indicated buying project, Smith went to the Broadside Bar. He did not have any contraband in his possession. Just outside the entrance he met Charley Curtis (Curtis), inferentially the party who had given Smith the lead. Curtis pointed out an

individual to Smith as the person in mind. (Later defendant was arrested as being that person, which he disputed. The jury decided he was.) The lighting was dim where defendant was in the bar. Smith went up to defendant, learned that his name was Dave, and had a five-minute conversation with him in the course of which he, in the proper jargon, inquired if he could purchase $10 worth of Seconal. Defendant indicated in the affirmative and left for the parking lot adjacent to the bar. Smith went to the rear entrance of the bar, saw him start toward the parked vehicles, and waited for him. Defendant returned, and, in exchange for the $10, gave Smith a plastic container of red pills which later analyzed out as Seconal.

There is no indication what the lighting was at the rear entrance to the bar near the parking lot. Presumably it was satisfactory since Smith gave no suggestion of difficulty in seeing the contraband and defense counsel did not cross-examine him as to this factor as he did with respect to the interior of the bar. Smith promptly turned the container and its contents over to his superior who was about a mile away.

About one hour later that day Smith made out a written report of the incident which was submitted to his superiors. The report contained a description of the seller and a summary of the transaction.[1]

On December 27, 1968, defendant was arrested for violating section 11912 of the Health and Safety Code, apparently along with other suspects in the finale of the "buy program." Smith did not participate in the arrest. As previously indicated, defendant's position became, in effect, that the police had arrested the wrong man.

The issuing of a complaint, the holding of defendant to answer after a preliminary hearing, the filing of an information charging a violation of section 11912, Health and Safety Code, and the entering of a plea of "not guilty" followed.

At the trial, which was before a jury, Smith testified for the People. On cross-examination he agreed that in "buy programs" a big issue in the ensuing trials is identity, and he stated that he had "made it a point in his activity to record correctly," suggesting that he had a trait of character for or, perhaps, the habit[2] of carefulness. He was then asked, "Has [sic]

---

[1]Smith's account of the transaction in the report was confusing because, as explained by Smith on cross-examination, he started at the point where defendant came back to him from the parking lot with the pills at the rear of the bar and then went backwards in time and dealt with the conversation which led up to the buy.

[2]The idea of a habit was never followed up, so we give no further consideration to it. Of interest, though, is the thought that habit is more acceptably proved by

there been any occasions where you have made a buy where you mis-identified a person?" (hereafter, the "initial question"), the purpose presumably being to bring out by specific instances through an affirmative answer, or by countervailing proof that Smith did not have such a trait of character or habit. The trial court requested Smith not to answer, and the deputy district attorney indicated that the question introduced an area that court and counsel had previously agreed to take up in chambers, thus implying an objection to the question at that point. A conference at the bench, inaudible to the jury, then ensued at the end of which the deputy district attorney announced for all that he withdrew his objection to the question. Smith then answered it in the negative. The cross-examiner then went on to other matters, and it is evident, from later developments, that it had been agreed that the question of whether defense counsel might proceed further in some manner into the critical area was postponed for consideration at a later time.

However, shortly thereafter, in recross-examination, after testimony by Smith on redirect-examination that out of about 100 persons contacted and 30 buys made, defendant had been the only Negro and that there was no doubt in his mind that defendant was the one from whom he had purchased the dangerous drugs, defense counsel asked Smith if, in his "buy program," he had ever made a purchase of a narcotic and indicated in his report what had been purchased and then turned over a different quantity to his superior. An objection by the deputy district attorney, not on the basis that this was in the postponed area, but on the ground that it was immaterial and beyond the scope of redirect, was sustained.[3] Defense counsel asked to be heard. The trial court advised it would take the matter up out of the presence of the jury. It did consider the matter during the noon recess.

Defense counsel first indicated that identity was the biggest issue in the case. He suggested that he had three points to make. He first said

specific instances than character. (See generally the article by William G. Hale, *Some Comments on Character Evidence and Related Topics,* 22 So.Cal.L.Rev. 341, also found in Selected Writings on Evid. & Trial, Assn. of Am. Law Schools (West Pub. Co. 1957) p. 651, at p. 655.)

[3] It may be that if the deputy district attorney had not had immateriality and scope in mind, he would not have objected to this question, consistent with his withdrawal of his objection to the prior question concerning misidentification. However, it is true that the subject matter of the second question was not as directly relevant to the issue of identification of defendant as was the former question. It would seem that the deputy district attorney, with respect to the first question at least, was operating under the concept that a limited amount of cross-examination with respect to Smith's identification procedures in other "buy" transactions, with the defense being bound by the answer elicited, was not improper.

that he was prepared to impeach Smith (meaning his sincerity) when he testified that he had not made any misidentifications before. With respect to this, he made reference to the grand jury proceedings regarding one McColeman. He wished to present the testimony of Smith given at that hearing which implicated McColeman in a narcotic transaction and then to establish, by a certified copy of the jail records or by the testimony of McColeman's attorney as to when he had secured McColeman's release from custody through a bail bond, that McColeman was in jail at the time Smith supposedly had been dealing with him (suggesting a misidentification). Defense counsel cited two other episodes in his offer of proof which, apparently, he also considered supportive of his intended impeachment of Smith's sincerity in his testimony that he had never made a misidentification.[4] He also wanted to introduce part of a written police report of Smith concerning one Curtis and one Cavanaugh to the effect that Cavanaugh said that he had only two pills left which he would sell for $1 and then put in part of the transcript of their preliminary hearing wherein Smith failed to implicate Cavanaugh and, when confronted with his report, admitted that it was inaccurate (suggesting another misidentification as far as Cavanaugh is concerned). Defense counsel further proposed to show, evidently through the admission into evidence of another report from Smith to the police, that at the same time that Smith was turning over contraband obtained from one Carpenter (11:40 p.m.), he, purportedly, was making a buy from another person he identified as "John Doe #1," (suggesting that Smith was lying in one of the reports [probably as to John Doe #1 because the turnover of contraband to the police likely would appear on their records]; suggesting, in turn, that if Smith would lie in this respect, he would also lie in court).

Defendant's trial counsel's offer of proof then alluded to two additional occurrences which, although counsel failed to articulate the point as such, appear to be directed to the idea that misreporting in two other "buy" episodes would indicate that Smith could have made and did make a misidentification in the "Broadside Bar" event. It seems likely that trial counsel also wanted the trial court to consider that the asserted misidentification episodes involving McColeman and Cavanaugh applied to this point. Although, again, there was a failure in articulation, it is possible that defendant's attorney had in mind two aspects with respect to this point: (1) that the misreports and the misidentifications in these other

---

[4]Trial counsel for defendant did not set these instances out in direct order or explicitly assert that they pertained to his first point. We think, however, that they did. It is also likely that trial counsel intended that these first three episodes be considered as applicable to what we believe to be trial counsel's second and third points, to wit, that the episodes indicated that Smith had a trait of character or a physical incapacity which caused him not to perceive accurately or not to recollect faithfully.

transactions showed that Smith had a physical incapacity for accurate perception or for faithful recollection, or both (possibly poor eyesight or defective brain cells); (2) that they showed that Smith had a trait of character disposing him to inaccurate perception or retention, or both (carelessness as to detail and indifference as to the inculpation of the innocent). These, presumably, were trial counsel's second and third of the three points which he said he had to make.

With respect to the two misreports, trial counsel proposed to prove (1) that a synopsis of Smith's reports to the police as to one Billman indicated a purchase of a "baggie" of marijuana, the analysis of which showed the presence of a cigarette as well, and (2) that, as to an established purchase of one tablet of LSD from a person by the name of Cates, Smith's report showed two tablets turned over to the police.

The deputy district attorney argued that, "it [was] not proper to impeach a witness in this capacity by showing he [had] made mistakes in the past" or "[had] made reports where there may [have been] some conflict[,] because . . . then by way of rebuttal [the prosecution] could bring in . . . all the cases where there [had] been guilty pleas." He pointed out that of the people mentioned by defense counsel in his offer of proof, "three had made guilty pleas" and that there were some 60 cases in which Smith had acted. He continued his argument by saying that "the Evidence Code just says this isn't proper impeachment because it is so time-consuming [mentioning that it would take about a month to try all the cases Smith had been on]." He advised that he could not let the jurors hear how Smith "maybe made a mistake on one" without telling them that there were " 'About . . . 57 cases he is going to trial on where there have been eight convictions and one hung jury [and] that he [was] buying a lot of narcotics and for the most part his identifications [were] correct.' " Defendant's trial counsel said that he agreed with the deputy district attorney "to a certain extent" but urged that, "if this officer [was]`so sure on [this] case [which had "the primary issue of identification"] and [was] so sure on another case, and it [was] proven that he [was] wrong on . . . the latter case," this would be "impeachable material for the jury to consider."[5] The trial court then stated: "The Court having heard the arguments of counsel sustains the objection of [the attorney] for the People on all three points raised by [trial counsel for defendant] and on his offer of proof. . . ."

Defendant then proceeded with his case. He and five witnesses presented the alibi that at the concerned time defendant was at his home and giving a party.

---

[5]The deputy district attorney then said, "Well, concededly." We are not quite sure what he meant by this remark.

The deputy district attorney, by way of impeachment of defendant's credibility, elicited from him that eight years previously he had been convicted of robbery, a felony.

At a motion for new trial counsel for defendant urged that his primary ground had to do with the trial court's refusal to receive the evidence that in two other cases Smith had made a misidentification, one wherein the alleged culprit was in custody and one as to which Smith had admitted an inaccuracy in his police report. The deputy district attorney vouched that "the Court [had] properly ruled that the Evidence Code excludes that type of evidence from being admitted on the grounds of impeachment, because if that were the case, by way of rebuttal the People could [have brought] in all of the cases where . . . Smith [had gotten] convictions and didn't make mistakes, and that [such evidence] does not have enough probative value . . . ." After argument on other points, the trial court stated: "Well, I don't think there was any error. . . . [W]e argued each of these points [defense counsel] raised. . . . I feel that I ruled on them according to law, and I think my rulings were correct; so, I will deny the motion for a new trial."

The only contentions made by defendant on appeal are: (1) that the trial court abused its discretion in permitting impeachment of defendant's credibility by proof of the eight-year-old robbery felony on the basis that it was remote in time and not related to the trait of untruthfulness; and (2) that the trial court erred prejudicially in disallowing the cross-examination of Smith on the subject of inaccuracies (misidentifying and misreporting) in his "buy" program. Without specifying it as a contention, defendant also argues in his brief that he was precluded from impeaching Smith by extrinsic evidence.[6]

As to the first contention, defendant urges that the trial court, under the provisions of section 352 of the Evidence Code,[7] had the right to rule that the probative value of the conviction by way of impeachment of credibility was outweighed by the probability that its admission would create a substantial danger of undue prejudice to defendant (indication of criminal disposition of the accused).

---

[6]Most of such extrinsic evidence was akin to cross-examination because it consisted of excerpts from testimony of Smith before the grand jury or in a preliminary hearing or from the contents of his written reports to the police. The only true extrinsic evidence would have been the certified copy of a jail record or the testimony of the attorney of McColeman to show his presence in jail at a certain time.

[7]Evidence Code section 352 reads in part as follows:
"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . (b) create substantial danger of undue prejudice . . . or of misleading the jury."

■ If the trial in the instant case had begun after the date of the decision of the Supreme Court in *Beagle, supra* (fn. 2 on pp. 454-455), the contention of defendant might have had some merit. The felony (robbery) was remote and involved violence (*People v. Beagle, supra,* p. 453). We use the word "might," however, because the crime also involved the taking of property. (*People v. Beagle, supra,* p. 453.) However, since this case was tried before *Beagle* it was and is governed by *People v. Kelly,* 261 Cal.App.2d 708, 712-713 [68 Cal.Rptr. 337], and *People v. Romero,* 272 Cal.App.2d 39, 45-46 [77 Cal.Rptr. 175] [of interest is the concurring opinion of Presiding Justice Kaus in *People v. House,* 12 Cal.App.3d 756, 768-774 (90 Cal.Rptr. 831)], and the subsequent decisions in accord cited in *Beagle, supra* (pp. 451-452).

As to the second main point on appeal, counsel for defendant first stresses that Smith testified before the jurors that there was no doubt in his mind that defendant was the person from whom he had purchased the capsules and that on cross-examination Smith stated that he had never made a misidentification in his "buy" program. In his ensuing contentions, appellate counsel seems to fail to distinguish between and to intermingle and confuse the process of cross-examination and the process of introduction of extrinsic evidence;[8] but in the ultimate analysis he appears to be arguing that the trial court erred in restricting cross-examination of Smith and in precluding the presentation of extrinsic evidence with relation to Smith's alleged mendacity and his propensity to misidentify and misreport.

Appellate counsel appears to be applying these contentions to both factors, Smith's confidence that defendant was the man in the bar and his confidence that there had been no misidentifications in any of the other "buy" transactions. Counsel on appeal does not differentiate between the concepts of a physical incapacity conducive to poor perception and recollection and of a trait of character conducive to such factors. Indeed, he does not even treat with the refinement of how misreports and misidentifications in other transactions could have led to a finding that there had been a misidentification in the incident under trial.

Nor does appellate counsel deal explicitly with the narrow issue of impeachment as to Smith's veracity through the device of cross-examination or of introduction of extrinsic evidence. However, there seems to be implicit in appellate counsel's presentation the contention that trial counsel

---

[8]For instance counsel on appeal states that "[Defendant's] lawyer wanted to impeach . . . Smith by introducing evidence of misidentifications and mistakes . . . . This would have been a proper use of cross-examination." Again, "the judge . . . would not allow [defendant] to present this evidence. This . . . constituted an improper denial of [defendant's] right to cross-examine witness."

was erroneously limited in an effort to demonstrate that Smith was untruthful when he said to the police that the photograph he selected from those displayed a couple of days after the incident at the bar depicted the man he had dealt with at the bar, and when he testified before the jury that defendant, as he stood there in court, was that man.

With respect to the alleged restriction of cross-examination, it is apparent from the record that defendant's trial counsel did not have an intention to cross-examine Smith any further than his second question as to which the objection was interposed and sustained and as to which he anticipated a negative answer. It seems clear that his intentions, if the answer had been permitted, were limited to proceeding with proof of the separate instances set out in his offer. Whether the trial judge should have permitted the answer seems a close question. The deputy district attorney had withdrawn his objection to the first question involving misidentification, and the matter of misreporting quantities of contraband, although slightly removed from the issue of misidentification, is certainly closely allied therewith, However, a negative answer alone would have been of no benefit to defendant, and it is clear that the trial court held to its sustaining of the objection because its major ruling was that it would not allow proof of the matters set out in defendant's offer. Thus, there clearly was no prejudice to defendant in the limited restriction of cross-examination.

It is not proper for defendant to urge on appeal, for the first time, that the trial court disallowed a process of inquiry into specific incidents which might show incapacity for sound identification by means of cross-examination only, a method defendant had not asked to be allowed to pursue, except for the two questions, one of which was allowed him by withdrawal of objection, but the other of which was denied him by the sustaining of an objection based on irrelevance and extension beyond the scope of redirect evidence. ■ However, even if a fair interpretation of defendant's position is that there was included in his offer-of-proof a desire to proceed by cross-examination if his primary request to present extrinsic evidence was denied,[9] we could not say that the trial court improperly exercised its right to curtail the inquiry. Although the referenced specific episodes allegedly took place in the Pomona "buy program," there was no foundational indication of points of similarity. The instances relating to inaccuracy of report as to quantity or type of contraband were not sufficiently relevant (the necessity to move from inference to inference to inference made it too weak in probative value). The factors involved were

---

[9]And we do not think it is.

cumulative; there was already before the jury an instance of faulty reporting (it had been shown that Smith had given two different versions as to the size of defendant) and there already was before the court a possible instance of faulty observation (Smith had testified as to his estimate of the size of defendant, and counsel's intimation is that the jury could see that defendant was not that size).

With respect to the claim that the trial court erred in not permitting defendant to impeach Smith's sincerity by extrinsic evidence, we proceed from the premise that defendant wanted to provide a basis for the jury to find that Smith was advertently lying when he told the Pomona officers that the photograph he selected depicted the man he had dealt with in the bar and when he told the jury that defendant, as he stood in the courtroom, was that man (i.e., deliberately made a false identification) by:

(a) showing (through evidence of contrary circumstances) that Smith had lied in court when he said to the jury that he had never made any misidentifications and that Smith would have been lying to the jury if, being allowed to answer the second question, he had said that he had never misreported a quantity of contraband; and

(b) showing that Smith lied in his report to Pomona officers when he said that he had made a buy from John Doe #1 at a certain time (by proving that at that same time he (Smith) was turning over evidence from another buy to superior officers).

The difference between these two situations is that in the first one the asserted lie is in court and in the second, out of court. The recent case of *People* v. *Lavergne,* 4 Cal.3d 735 [94 Cal.Rptr. 405, 484 P.2d 77], suggests that (1) proof of the former is allowable, but excludable under a fair exercise of discretion pursuant to Evidence Code section 352; but that (2) proof of the latter is impermissible.

In *Lavergne, supra,* four men robbed a clothing store. One of them was the defendant, another was one Oliver. In the defendant's trial, Oliver,[10] as a witness, implicated the defendant who denied complicity and asserted that he had not seen Oliver until he was in court. During his testimony, Oliver had mentioned several times the use of his (Oliver's) car in the crime. On cross-examination, the defense attorney asked Oliver where he got the car. Over the prosecution's objection, he was allowed to answer that he had bought it. The defense attorney then asked him if it was stolen. His reply was that it was not. The defense sought to impeach Oliver's sincerity

---

[10]Oliver testified that he had been permitted to plead "guilty" to second degree robbery in exchange for his testimony.

by introducing extrinsic testimony of proof indicating that the automobile was stolen. The trial court sustained the prosecution's objection, basing its ruling on Evidence Code section 352.

The Supreme Court holds, in substance, that the evidence the defense sought to have admitted, which contradicted the testimony of the witness, was relevant and admissible unless the judge found, in the proper exercise of his discretion, that it should be excluded under section 352 or unless there was some specific limitation on the introduction of such evidence. (P. 742.) As we see it, the Supreme Court finds the presence of both such features. First it notes that the matter on which trial counsel sought to impeach Oliver's sincerity was collateral: "The fact that the car was stolen had nothing to do with the facts at issue in the trial." (P. 742.) Then it states: "While collateral matters are admissible for impeachment purposes, the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury." (P. 742.) It quotes with approval the comment of the Law Revision Commission that the effect of section 780, when read with section 352, was to change the former somewhat inflexible rule of exclusion to one of discretion. (P. 742.) It stresses that a witness could have had a strong reason to lie about the collateral fact which reason would furnish no motive to lie in his other testimony. (P. 743.) Expounding the general principle that "Section 352 permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption[,]" it remarks as to the case under its review, "it cannot be said that the trial judge's ruling on this evidence, of which the probative value was slight and the chance of prejudice and confusion substantial, struck an improper balance and thereby constituted an abuse of discretion." (P. 744.)

The Supreme Court then specifies a further reason supportive of the exclusion of the proffered evidence. This seems to be in the second specified category: "other specific limitation on the introduction of such evidence." It observes that it appeared that the defendant's attorney, on cross-examination, intentionally elicited the testimony about the car for the very purpose of impeaching the witness; that, after an expected denial, he wished "to bring otherwise inadmissible testimony in to impeach him. [Footnote, number 6, omitted.]" (Pp. 743-744.) The Supreme Court then states: "A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted. (*Rousseau* v. *West Coast House Movers,* 256 Cal.App.2d 878, 887-888 . . . ; *Garcia* v. *Hoffman,* . . . 212 Cal.App.2d 530, 536-537 [28 Cal.Rptr. 98].) This is especially so where the matter the party seeks to elicit would be

inadmissible were it not for the fortuitous circumstance that the witness lied [in court before the trier of fact] in response to the party's questions." (P. 744.) (This factor appears to be present in the instant case.)

The omitted footnote (No. 6; see brackets above) in *Lavergne, supra,* deals, it is felt, with the second feature being considered, the asserted lie out of court on a collateral matter. It reads as follows: "The evidence showing that Oliver stole the Cadillac [without relation to the in-court (purchase) testimony] would constitute 'specific instances of his conduct[11] relevant only as tending to prove a trait of his character.' [Bearing on veracity: propensity to corruptness and turpitude.] Such evidence, unless of a felony conviction (§ 788), is not admissible. (§ 787.)" The corrupt act of car theft in *Lavergne* would compare with Smith's asserted mendacious out-of-court act of lying to a police officer that he had made a sale to John Doe No. 1 when, in fact, he had not.

The Supreme Court stresses the function of section 780:

"Section 780 of the Evidence Code provides that, except as otherwise provided by statute, the court or jury in assessing the witness' credibility may consider '*any* matter that has any tendency in reason to prove or disprove the truthfulness of [the witness'] testimony . . . .' That section sets forth 'a convenient list of the most common factors that bear on the question of credibility.' (Law Revision Com. Comment on Evid. Code, § 780.) Among those matters which the jury or judge may consider is the 'existence or nonexistence' of *any* fact testified to by the witness. (§ 780, subd. (i).) The nonexistence of a fact testified to is relevant insofar as it is an indication of the witness' general truthfulness and credibility on the witness stand. For this reason juries are instructed, as was the jury in this case, that a witness willfully false in one part of his testimony is not to be trusted in others." (P. 742.) ■ Thus, we understand, a jury may consider, as a matter tending in reason to show the untruthfulness of a witness' testimony, "[t]he nonexistence of a fact testified to" by him, even though the subject matter is collateral and the purpose is to show that the witness is a person prone to mendacity and therefore likely to be lying as to matters directly in issue (see § 787).

■ The Supreme Court, therefore, despite the introductory provisional phrase of section 780[12] does not believe that section 787 prevents showing that a witness on the stand lied about a specific instance of conduct by

[11]So, it would seem, would have been that defendant's admission of theft on cross-examination if he had made such rather than a denial.
[12]"Except as otherwise provided by statute . . . ."

establishing what that conduct really was,[13] even though the result of the combination of the false statement in court and the extrinsic proof of the circumstance involved tends to prove the trait of character of propensity to prevaricate.[14]

It is clear that the out-of-court episode involving John Doe No. 1 was inadmissible under footnote 6 of *Lavergne, supra*, and section 787, to the extent that it merely proved a trait of Smith's character. It is also clear that the trial court was satisfied that the argument of the deputy district attorney was well founded both legally and factually and that it exercised its discretion under section 352 in keeping out the evidence calculated to show that Smith had made two misidentifications despite his testimony that he had made none. Although the deputy district attorney did not specifically refer to section 352, it is obvious from the Evidence Code policy points which he argued that he had this section in mind.

To the extent that the trial court voiced a basis for its ruling, it appears that it was adopting the concept put forward by the deputy district attorney that the probative value of any[15] of the proffered items of proof for whatever purpose they might have been available was outweighed by the adverse policy considerations of time consumption, confusion of issues and prejudice[16] against the People's case. This position may have been adopted as to matters which normally would have been inadmissible pursuant to other rules, under the concept that the prosecution had "opened the door" therefor by its withdrawal of its objection to the initial question. (See Comment, 1955 Wash. U. L.Q. 209, also found in Selected Writings on Evid. & Trial. Assn. of Am. Law Schools (West Pub. Co. 1957) pp. 439-442.) We note that if Smith had happened to have answered the initial question in the affirmative, such response would have carried the connotation that the admitted misidentification came as the result of a physical incapacity or a character trait. We are cognizant of the decisions which hold that a party takes his

---

[13]The only control would be through section 352.

[14]Section 787 reads as follows: "Subject to Section 788 [prior felony conviction], evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."

[15]It would have been quite significant for defendant to have been able to show just one other occasion of mistaken identity in light of Smith's assertion that he had made no such mistakes. For the prosecution then to have shown other occasions when no misidentifications had been made (based on pleas or convictions) only would have suggested that Smith's untruthfulness was not so culpable if there was but one incident out of many. However, this would still have had some pertinence and so time consumption and confusion of issues were factors for consideration.

[16]Because of a provoked jury disenchantment with the witness, Smith.

chances as to the type of answer he will get to such a question and must be bound by it without the right to counter an unsatisfactory response. (*People* v. *Lo Cigno,* 193 Cal.App.2d 360, 380 [14 Cal.Rptr. 354]; *People* v. *Vanderburg,* 184 Cal.App.2d 33, 41 [7 Cal.Rptr. 287].) Although it did not say so, the trial court may have had this line of cases in mind also.

As indicated previously, a good part of the offer of proof related not to asserted false identification and insincerity, but to the proposition that Smith was inadvertently mistaken when he told Pomona officers that the photograph he had selected from those displayed depicted the man he had contacted in the bar and when he told the jurors that defendant, as he appeared in court, was that man. We consider this aspect of the case on the premise that defendant wished to make available to the jury the inference for this by providing another inference through specific instances of conduct (misidentification of Coleman and Cavanaugh and misreporting the quantity of contraband actually involved in two other transactions) that (1) Smith had a trait of character which rendered him prone to make such mistakes (i.e., carelessness for detail and indifference to inculpating the innocent); or (2) Smith had a physical incapacity for perception or for mental retention of an experienced perception, or both (such as poor vision or defective brain cells).

The use of evidence of traits of character other than honesty or veracity or their opposites is not permitted in attacking or supporting the general credibility (not just sincerity) of a witness. (§ 786.) Even if such use were permitted, evidence of specific instances of conduct relevant only as tending to prove a trait of character is inadmissible to attack or support the general credibility of a witness. (§ 787.) The trial court could have ruled on this basis, and maybe it did have these sections instinctively in mind. On the other hand, it may have felt, as suggested above, that the door had been opened and that its recourse was to the weighing process under section 352. If its action was under section 352, which it seems to have been, it was adequately supported.

The extent of the capacity of a witness to perceive and recollect any matter about which he testifies is admissible as having a tendency in reason to prove or disprove the accuracy of the witness's testimony. (§ 780, subd. (c).) To the extent that evidence of misidentifications or misreports in other transactions was offered for this purpose, section 787's proscription against the use of specific instances of conduct was not at bar to its receipt. ■ As indicated in *Lavergne, supra,* and in the comment of the Law Revision Commission applicable to section 780, there is no specific

limitation in the Evidence Code on the use of impeaching evidence on the ground that it is collateral. ■ The effect of section 780 (together with § 351) is to eliminate the inflexible rule of exclusion. However, under section 352, the court has substantial discretion to exclude collateral evidence.

It is not clear that the trial court had physical incapacity in mind as an inference which might be drawn by the jury. However, if it did, it is obvious that it acted to exclude the indicated extrinsic evidence under the discretion given it by section 352. As to one of the aspects of the test, the route by inference from misidentification and misreport to some physical incapacity is not smooth and direct; and the move from the possibility of some kind of physical incapacity to the determination that such incapacity interfered with the ability of Smith to perceive with whom he spoke for five minutes in the Broadside Bar and exchanged money and capsules near the parking lot thereof is not a facile one. As to the other aspect of the test, the probative value for this concept was weak. The problem of time consumption was a distinct reality because with respect to this concept, it would be even more appropriate for the prosecution to show the number of accurate identifications and reports. Also present, with respect to the other concepts examined, was the probability of confusion and prejudice.

Finally, it is to be noted that there was one factor in the identification area which would not have been subject to weakening by any course of proof proposed by defendant, and that is that defendant had been made known to Smith as Dave, that he had acknowledged to Smith that he was Dave, and that in truth, his name was Dave.

The judgment is affirmed.

Kaus, P. J., and Aiso, J., concurred.

A petition for a rehearing was denied April 10, 1972, and appellant's petition for a hearing by the Supreme Court was denied May 23, 1972.