[Crim. No. 14526. Fourth Dist., Div. Two. Jan. 5, 1983.]

THE PEOPLE, Plaintiff and Appellant, v.
JAMES FRANK STONE et al., Defendants and Respondents.

---

### COUNSEL

R. D. Thompson, Acting District Attorney, and Leonard H. Mandel, Deputy District Attorney, for Plaintiff and Appellant.

Roth & Streifer, Andrew I. Roth, Wallace B. Farrell, Tom F. Maniscalco, Michael B. Lewis, Public Defender, and Robert E. Habereder, Deputy Public Defender, for Defendants and Respondents.

---

### OPINION

**KAUFMAN, Acting P. J.**—The People appeal from an order of the superior court dismissing an information.[1] The superior court made its order after concluding that certain evidentiary rulings by the magistrate at the preliminary hearing required the granting of defendants' Penal Code section 995 motion. We reverse.

### FACTS

On July 14, 1982, officers from the Los Angeles Police Department clandestine lab squad observed defendants Nadine Lemonds and George Gray drive up to the Student Science Service Supply House in Glendale, California. The officers were observing the supply house because they knew supply houses such as that one sometimes sell chemicals used to make illegal drugs. The two defendants were in an orange Charger automobile. Lemonds got out of the car, and entered the store. She remained there about 15 or 20 minutes and then came out, carrying a large box containing numerous items. One of the officers, Detective Daniel Lang, caught a glimpse of some of the items. He saw the cap of a jar, a long straight object and the top of a small cardboard box. Detective Lang also recognized Lemonds from a prior arrest he made in 1973 in the Twenty-Nine Palms area. The arrest involved a methamphetamine lab.

---

[1]The information charged all defendants with the unlawful manufacture of methamphetamine, possession of chemicals with intent to manufacture methamphetamine, and conspiracy to commit the crime of manufacturing methamphetamine. The information also charged the Gardners with unlawful possession of a machine gun and unlawful possession of a silencer for firearms.

Lemonds put the box in the back seat of the car. The Charger then drove to a residence in North Hollywood. The officers noted the car did not take a direct route and that it altered its speed drastically on the freeway. From this, they formed the conclusion the car was driving "evasive[ly]."

At the residence in North Hollywood, Detective Lang observed Lemonds at the rear of the car with the trunk open. The Charger then drove to a shopping center on Foothill Boulevard, another North Hollywood residence, a North Hollywood apartment, Laurel Canyon, Reseda, back to Laurel Canyon, a Jack-in-the-Box restaurant, back to the apartment in North Hollywood, and finally ended up at a residence in Riverside.

At the Riverside residence, Detective Roy Wunderlich observed a number of items being taken out of the trunk by Lemonds and Gray: a half gallon amber jug, plastic buckets, stirring motors, glassware and a graduated cylinder. He recognized these items as commonly used in the normal operation of a clandestine lab. The officers then set up a command post at a nearby fire station and began to take turns watching the residence. The observation lasted two days.

About 4 a.m. on July 17, Detective Wunderlich smelled ether. The smell came off and on. At the time, Wunderlich was 400 yards north of the front of the garage area of the residence. By 5 a.m., Wunderlich had identified the odor as coming directly from the residence. Wunderlich believed there was danger of an explosion because of the volatility of ether vapor which may explode upon contact with static electricity or a pilot light. Wunderlich then rushed to the fire station and woke up Detective Lang, to tell him what he had smelled. The officers then made the decision to go into the residence, ventilate fumes, take any residents into custody, put out pilot lights, and have the fire department come and air out the whole area. The officers got back to the area between 30 and 45 minutes later, taking some members of the fire department with them. As he approached the residence in a car Detective Lang also detected the smell of ether. The car came to a stop in front of the garage of the residence. The ether appeared to Detective Lang to be originating in the garage area.

The officers announced they were making a narcotics investigation, and entered the residence and its garage. Inside the garage they noticed a small laboratory. Detective Wunderlich left for the Riverside Police Department to complete a search warrant. He gained the warrant by 8:30 and came back. He gave a copy of the warrant to another officer who then served the warrant on Mr. and Mrs. Gardner, the only defendants still at the location. The search pursuant to the warrant turned up a number of items associated with clandestine labs, as well as a machine gun and a firearm silencer.

At the preliminary hearing, on recross-examination, counsel for one of the defendants asked Detective Lang how many labs he had visited over the past year. Lang replied he was involved in the seizure of approximately 10 to 12 labs. Counsel then asked how many of those labs he entered with a warrant. The court sustained the deputy district attorney's objection on the ground the question was irrelevant. In response to counsel's offer of proof that the question was relevant as to whether the clandestine lab squad officers deliberately created exigencies when they otherwise could have obtained warrants, the court stated that "This case will have to be dealt with on its own merits . . . . Otherwise, it's a fishing expedition."

On continued recross-examination, counsel for another defendant asked Detective Lang a similar question: "how many times have you participated in the seizure of clandestine laboratories?" Again the court sustained the objection on the ground the question was irrelevant. Counsel then stated that he had overheard a conversation between a Riverside police officer (hereafter the Riverside officer) and a member of the public defender's office in which the police officer attributed a statement to Detective Wunderlich to the effect that the clandestine lab squad "doesn't use search warrants, and that 99 percent of the time the cases stick anyway." Counsel argued the question was relevant to show the "prospect of a ruse to tactically use the so-called ether smell" to create exigent circumstances to enter premises. The deputy district attorney then argued that the question was "irrelevant, immaterial" and not "probative." He argued that if the court "[got] into this area" the district attorney "could ask the officers [about] each and every investigation" on which they had worked.

The court then stated that the "best way to raise" the issue for the record would be to have "this officer [presumably the Riverside officer]" testify. Counsel then argued that he should be able to "at least establish the possible foundation for impeaching testimony by the other officer." The court then reiterated its position that the Riverside officer should testify before the matter could be brought up. Further argument ensued during the course of which the deputy district attorney contended that the proposed line of questioning would "be extremely time consuming." He raised the spectre that if defense counsel showed that on previous occasions clandestine lab squad officers did not get a warrant, he would be entitled to show that on other occasions they did. "We'd have to go into the facts of each and every case, every one of them. If we get into this thing and there are any, the probative value with this if there is any, is going to be minimized, because this will be extremely time consuming. We could sit here for weeks talking about each and every investigation that every other clandestine lab had." The court reiterated its position, reasoning that the proposed questioning would get "into too many other suppositions."

Defense counsel attempted the same line of questioning on cross-examination of Detective Wunderlich. Again counsel argued that the questioning was relevant to show that the smell of ether "may simply be ruse on the part of law enforcement." The court stated that it did not "feel that the other matters [were] relevant. I think we would have to get into each individual situation and determine whether or not this was warranted in that particular situation." One of the counsel for defendants mentioned the witness' "statements to the other officer" raising the prospect that if the witness denied the statement the line of questioning might be relevant to impeach. The court replied that in such a case questioning would concern a "collateral matter" or "an impeachment of a collateral matter." After yet more argument the court stated, "we are getting redundant and the court is being redundant and I think the record is pretty complete as far as the request to have this admitted."

On a 995 motion in superior court, defense counsel argued that the proposed line of questioning would have tested the credibility of the witnesses. As the superior court understood the defendants' argument, the line of questioning went to "general credibility. If [Wunderlich's] lying on that, he's lying about everything else." The court ruled that "Denial of cross-examination to test credibility" required that the entire direct testimony of Detective Wunderlich be stricken. Striking that testimony, the court stated that there was not probable cause to hold any of the defendants, and granted the 995 motion.

### The Issue

■ Not every error in procedure or erroneous evidentiary ruling by a magistrate at a preliminary hearing requires an information to be set aside. However, the denial to the defendant of a "substantial right," such as disallowance of cross-examination on a vital issue, will invalidate the commitment. (*Jennings* v. *Superior Court* (1967) 66 Cal.2d 867, 874, 879 [59 Cal.Rptr. 440, 428 P.2d 304]; *People* v. *Barrett* (1969) 2 Cal.App.3d 142, 148 [82 Cal.Rptr. 424].) Thus, counsel for Victoria Gardner correctly identifies the issue in this case as "whether the respondent was denied a substantial right at the preliminary hearing when they [*sic*] were denied the right to cross-examine the officers of the clandestine lab squad to test their credibility as to whether an alleged exigency existed or whether it was invented to circumvent the need of securing a warrant, to impeach the testimony of the officers, and to discover evidence in order to overcome the prosecution case that the forged entry was legal."

### Discussion

This case, then, must turn on whether the magistrate's denial of defendants' proposed line of questioning amounted to a deprivation of a substantial right or,

conversely, was properly within the scope of the magistrate's discretion. While no easy formula for "substantial right" was promulgated by *Jennings* (see Graham & Letwin, *The Preliminary Hearing in Los Angeles: Some Field Findings and Legal-Policy Observations* (1971) 18 UCLA L.Rev. 635, 754), the cases do give adequate guidance. *Jennings* itself mentioned that such things as the denial of the right to counsel, the denial of the right to be advised of the right to counsel, or the denial of a reasonable continuance to allow the defendant to send for counsel, constituted denials of substantial rights. (*Jennings* v. *Superior Court, supra,* 66 Cal.2d at p. 874.)

*Jennings* held that the denial of cross-examination of the arresting officers concerning their previous contact with a woman who ran from defendant's car just prior to his arrest denied a substantial right where the defense claimed entrapment. The court said that because the "subject of cross-examination concern[ed] the matter at issue" the limitation resulted in a denial of a fair hearing. (*Jennings* v. *Superior Court, supra,* 66 Cal.2d at p. 879.) A similar case, *Gallaher* v. *Superior Court* (1980) 103 Cal.App.3d 666 [162 Cal.Rptr. 389], held that denial of cross-examination at the preliminary hearing as to anything that happened immediately after the criminal event there at issue, a shooting, denied the defendant a substantial right. In *Gallaher,* the prosecution witness had been the driver of the very car from which the defendant had exited to commit the shooting. After the shooting, the defendant walked back to the car and told the witness, "I shot him." The magistrate did not allow the defense on cross-examination to examine the witness as to anything the witness might have heard from defendant immediately after he uttered those words.

*Jennings* and *Gallaher* thus demonstrate that denial of cross-examination concerning events which were part of the actual criminal transaction itself denies the defense a substantial right. By contrast, case law also reveals that a trial judge, and a fortiori, a magistrate conducting a preliminary hearing, is within his discretion in denying cross-examination of a prosecution witness as to matters not relating to the criminal event itself and which only affect the weight of the direct testimony. In *People* v. *Ross* (1969) 276 Cal.App.2d 729 [81 Cal.Rptr. 296], the judge cut off cross-examination concerning the prosecution's witness' ability to identify someone who was then in court whom he had seen before at an earlier trial. The witness' ability to remember and identify was directly at issue in the case, because the witness had been the victim of a clothing store robbery and testified that he was able to directly observe the man who had placed the gun at his back and had been the principal speaker for the robbers. The witness made an "unequivocal" identification of the defendant as that man. On cross-examination the witness was asked by defense counsel whether he could remember who were the court personnel at an earlier trial. As to one individual in particular, then sitting in the courtroom at the later trial, the witness said, "I'm not positive, but I think so," and again, "I am quite sure

about him but I am not positive." At this point the trial judge stopped the questioning. Defense counsel then offered to show that the particular individual from the first trial was a female white where the person the witness had identified was a male black. The evidence was obviously relevant as to the witness' ability to remember the identity of a person he had seen previously as well as cast doubt on his general credibility, given that the witness was "quite sure" about the identification. Nevertheless, the appellate court held that the trial judge did not abuse his discretion by cutting off further cross-examination. (*Id.*, at p. 734.)

The cases also show that a judge may exclude extrinsic evidence concerning events or transactions for which the defendant is not prosecuted, *though relevant* to the credibility of a prosecution witness.

In *People* v. *Lavergne* (1971) 4 Cal.3d 735 [94 Cal.Rptr. 405, 484 P.2d 77], our Supreme Court held the refusal by the magistrate to allow the defense to introduce testimony showing that a prosecution witness had stolen the automobile which he had previously testified he had bought was within the discretion of the magistrate. (*Id.*, at p. 744.) In *Lavergne,* the prosecution witness had used his car to drive two of the defendants near the scene of the crime. On cross-examination the defense attorney asked the witness where he got the automobile, and over the prosecution's objection, the witness stated that he bought it. The defense attorney then asked him if the car was stolen and he replied it was not. The defense then offered to show that the car had indeed been stolen. The Supreme Court noted that the fact the car was stolen had nothing to do with the "facts at issue" in the trial, and was a "collateral matter." (*Id.*, at p. 742.) The court acknowledged that the proffered testimony was relevant as to the witness' "general truthfulness and credibility on the witness stand." (*Id.*) Nevertheless, the court held that the judge was within his discretion in not allowing the testimony.

Likewise, in *People* v. *Moses* (1972) 24 Cal.App.3d 384 [100 Cal.Rptr. 907], the appellate court held the trial court was within the proper scope of its discretion in excluding evidence which would have shown that the prosecution witness had lied in court when he told the jury that he had never made any misidentifications and that he had lied in his report to police officers when he had said that he made a certain narcotics purchase from a particular individual. (*Id.*, at p. 394.) The proffered evidence in *Moses* was highly probative because misidentification and credibility were key elements in the defense's case. The deputy district attorney pointed out, however, that the probative value of the evidence would be outweighed by its undue consumption of time. (*Id.*, at p. 397.) If the defense had been allowed to bring in the prior misidentifications, the deputy district attorney claimed he would have to bring in instances where there had been no misidentification.

The present case, like *Ross,* but unlike *Jennings* or *Gallaher,* concerned a proposed line of cross-examination which did not involve the criminal transaction at issue. As in *Ross, Lavergne* and *Moses,* the proffered evidence in the present case could only have been relevant to impeach; unlike *Jennings* or *Gallaher,* the proffered evidence could not have added any more detail to the court's knowledge of the transaction at issue. The line of questioning in *Jennings* might have linked the police to the woman who ran from defendant's car and thus shown the possibility of entrapment concerning *the actual crime with which defendant was charged.* The question in *Gallaher* might have established *new facts about the shooting*: had the defendant said, for example: "I shot him," paused a moment, and then added, "But this was because he pulled a gun on me and was about to fire," the later statement would never have come to light. Conversely, in *Ross, Lavergne, Moses* and the instant case, the excluded evidence could only have been relevant, if at all, to the *weight* of the direct evidence. Exclusion of cross-examination which "only go[es] to the weight of the direct evidence" does not deny the defendant a fair hearing. (*People* v. *Wilson* (1960) 183 Cal.App.2d 149, 152-153 [6 Cal.Rptr. 872]; see also *People* v. *Lipinski* (1976) 65 Cal.App.3d 566, 577 [135 Cal.Rptr. 451] ("the proffered testimony would have created but a conflict in the evidence . . . .").)

▪ In the present case, the line of questioning proposed by the defense, if relevant at all, was relevant only as to the credibility of the officers when they testified they smelled ether. Even then, the route by inference from the possibility that the clandestine lab squad never gets search warrants to the possibility that they lie when they claim to smell ether is, as *Moses* would put it, "not smooth and direct." (See *People* v. *Moses, supra,* 24 Cal.App.3d at p. 399.) As in *Moses,* the proffered evidence entailed a substantial time commitment for evidence of only tenuous relevance, and that going only to general credibility. The magistrate therefore had the discretion[2] to exclude the evidence.

---

[2]Evidence Code section 352 provides that a court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time." The superior court in the present case did not believe that section 352 was at all applicable. The superior court said: "Justice Mosk in a very recent decision spells out that when a trier of fact uses 352, he must clearly delineate on the record the weighing process between the fact that its probative value is substantially . . . outweighed by some of the other factors, whether it be too time consuming, liable to mislead the jury, or unduly prejudicial. [¶] That is not anywhere here in this record. So, no, there is no 352 in this case."

The decision to which the court referred is apparently *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468]. *Green* said: "[T]he *record* must affirmatively show that the trial judge did in fact weigh prejudice against probative value." (*Id.,* at p. 25; italics added.) Even assuming, for the sake of argument, that the magistrate here did not delineate on the record the weighing process he used, the superior court's reading of *Green* is not in accord with *Green's* operative language. There is a difference between the *record* showing that the judge weighed probity versus prejudice, which is what the language in *Green* states, and the judge's doing the *weighing itself* on the record. *Green* explains that the reason for its rule "is to furnish the appellate courts with the record necessary for meaningful review of any ensuing claim of

An independent reason why the magistrate did not err in limiting the cross-examination is that the line of questions was intended, in defense counsel's own words, to "establish the possible foundation for impeaching testimony by the other officer [the Riverside officer]." The California rule is enunciated by our Supreme Court in *Lavergne*: "A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted." (4 Cal.3d at p. 744.) As the preceding comparison of *Jennings* and *Gallaher* with *Ross, Lavergne* and *Moses* showed, the proffered line of questioning in this case was collateral because it did not concern the transaction at issue, but rather other searches. The magistrate's exclusion then came squarely within the *Lavergne* rule.

### DISPOSITION

The order of the superior court pursuant to section 995 granting defendants' motion to dismiss the information is reversed.

McDaniel, J., and Rickles, J., concurred.

A petition for a rehearing was denied January 20, 1983, and the petitions of respondents Gardner for a hearing by the Supreme Court were denied April 13, 1983. Bird C. J., was of the opinion that the petitions should be granted.

---

abuse of discretion; an additional reason is to ensure that the ruling on the motion 'be the product of a mature and careful reflection on the part of the judge,' i.e., to 'promote judicial deliberation before judicial action' [citation]." (*Id.*, at p. 25.) In the present case over 10 pages of the record are devoted to discussion between the attorneys and the court concerning the present issue. There is more than enough for meaningful appellate review: the record reveals that the trial judge heard arguments by the defense as to the precise nature of the relevance of the proffered testimony and by the deputy district attorney going to the question of time consumption.

Finally, even assuming, for the sake of argument, that the magistrate should have done his weighing on the record, the record reveals that he did just that. The magistrate addressed himself to the collateral nature of the proffered evidence when he stated: "This case will have to be dealt with on its own merits," and its lack of relative probity when he termed the evidence part of a "fishing expedition." It is also evident that the magistrate incorporated counsel's various arguments into his weighing process when he stated: "the record is pretty complete as far as the request to have this admitted."