Filed 6/17/14  P. v. Sedillo CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B249224 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  NA089924) |
| v. | |
| JULIAN SEDILLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jonathan J. Kline and Jonathan M. Krauss, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Julian Sedillo was convicted of attempted voluntary manslaughter and shooting at an occupied motor vehicle. He contends the trial court improperly excluded evidence and limited his cross-examination of the alleged victim during the trial; in addition, he maintains his counsel rendered ineffective assistance. He also asks that we independently review the transcript of the trial court's in camera hearing regarding certain police records potentially subject to discovery under *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*). We reject appellant's contentions of error, and upon an independent review of the in camera hearing, ascertain no improperly withheld evidence. We therefore affirm.

### RELEVANT PROCEDURAL BACKGROUND

On March 1, 2012, an information was filed, charging appellant with the attempted willful, deliberate, and premeditated murder of David Lopez (Pen. Code, §§ 187, subd. (a), 664), and shooting at an occupied motor vehicle (Pen. Code, § 246). Accompanying the charges were gun use allegations, including an allegation that appellant personally discharged a handgun, thereby causing great bodily injury to Lopez. (Pen. Code, § 12022.53, subds. (b) - (d).) Appellant pleaded not guilty and denied the special allegations.

Prior to trial, appellant sought disclosure of so-called "*Brady* material" contained in the records of the Los Angeles Police Department's investigation of the murder of appellant's friend, James Dominquez. At appellant's request, the trial court conducted an in camera review of the investigation records for evidence potentially linking Lopez to Dominguez's murder, and ordered the disclosure of one report containing a confidential informant's statements.

A jury found appellant not guilty of attempted willful, deliberate, and premeditated murder, but found him guilty of the lesser included offense of attempted voluntary manslaughter (Pen. Code, §§ 192, 664), and found true the

2

allegation that he personally used a handgun in the commission of that crime (Pen. Code, § 12022.5, subd. (a)). The jury also found appellant guilty of shooting at an occupied motor vehicle, and found true the accompanying allegation that he personally and intentionally discharged a handgun, thereby causing great bodily injury to Lopez. On June 3, 2013, the trial court sentenced appellant to a total term of imprisonment of 30 years to life.

## FACTUAL BACKGROUND

A. *Prosecution Evidence*

In August 2011, David Lopez lived in Wilmington, drove a red 2010 Dodge Challenger, and dated Erika Nolan. According to Lopez, prior to August 27, 2011, he did not know appellant, although he had sometimes seen him with other males near Nolan's house, which was located on Dolores Street. On those occasions, Lopez gave appellant a "friendly hello" when he visited Nolan, even though appellant and his comrades appeared to "mad dog[]" him, that is, stare at him in a hostile manner.

Lopez testified that on August 27, 2011, he and Nolan planned to go to the beach. Between 4:00 and 4:15 p.m., Lopez drove to a service station for gas, in preparation for their beach trip. As he returned to Nolan's residence, he saw appellant driving a green Chrysler 300 closely behind him. Lopez did not know why appellant was following him. Lopez decided to drive past Nolan's house and turned around in the parking lot of a nearby church. After entering the parking lot, Lopez began to back up, but was blocked by appellant's car.

According to Lopez, when he looked at appellant's car, appellant pointed a gun at him. Lopez ducked and heard six gunshots, one of which struck his shoulder and lodged in his neck. Lopez lost consciousness for several moments.

3

When he regained consciousness, appellant had driven away. Nolan drove Lopez to a hospital emergency room, where he received treatment for his injuries.

Lopez further testified that while hospitalized, he was visited by his cousin, Mallory Guillen. When Lopez described the shooter and his car, Guillen found some Facebook and MySpace pages based on Lopez's description. The Facebook and MySpace pages displayed photographs of appellant holding firearms. After recognizing appellant as the shooter, Lopez brought the Facebook page to the attention of investigating police officers, and told them that appellant might belong to a gang. Lopez later identified appellant as the shooter in a photographic six-pack and at the preliminary hearing.

Lopez stated that he knew of someone named James Dominguez, but denied ever threatening him. Lopez also stated that he neither threatened appellant nor displayed a gun to him prior to the shooting, and that he "leveled" no gun at appellant during the shooting. Lopez further testified that approximately one month after the shooting, he bought a gun in order to protect himself. According to Lopez, he was too young to own a registered gun, and suffered a conviction for carrying the gun as a concealed weapon.

David Galvan testified that he lived on Dolores Street. On August 27, 2011, between 4:00 and 4:15 p.m, Galvan returned home after riding his motorcycle. As he walked out of his garage, he saw a burgundy Challenger driving slowly along Dolores Street, side-by-side, with a light blue or green Chrysler 300, which was in the lane for oncoming traffic. According to Gavlan, the Chrysler's driver pulled out a gun, fired several shots into the Challenger, and sped away. The Challenger pulled into a church parking lot, reversed, struck a parked truck, and moved a short distance before stopping in front of a house. A girl then ran from the house to the car. When the driver said that he needed to see a doctor, the girl entered the car, which drove away.

4

Erika Nolan testified that while she waited for Lopez to return from the gas station, she watched Dolores Street through windows in her house. She saw Lopez drive by the house and enter the church parking lot, tailgated by a green Chrysler. When Lopez tried to back out of the parking lot, the Chrysler blocked him, and Nolan heard shooting. As she ran from her house toward Lopez, she saw the Chrysler drive away. She then drove Lopez to an emergency room.

Julian Sedillo, appellant's father, testified that he owned a green Chrysler 300 and three firearms, including a .40 caliber Smith and Wesson semiautomatic handgun that he bought in May 2011.[1] At the time of the shooting, appellant lived with his father "pretty much of the time," often drove the Chrysler 300, and had access to the .40 caliber Smith and Wesson, which was stored in appellant's room.

According to Los Angeles Police Department Officer Jaroen Hitanukulkit, six .40 caliber Smith and Wesson shell casings were found at the scene of the shooting. After the shooting, Hitanukulkit met Lopez in the emergency room. While Hitanukulkit examined Lopez's car, Lopez's cousin Mallory told him that the shooter was appellant. Later, after Hitanukulkit returned to his office, he received a phone call from Lopez, who said that Mallory had located the shooter's Facebook page.

Los Angeles Police Department Detective Matthew Maffei testified that he secured a search warrant for the house owned by appellant's father. Although the officers discovered .40 caliber ammunition in the house, they found only an empty gun box in appellant's room. The .40 caliber Smith and Wesson handgun usually stored in that box was never located.

---

[1]     Scott Marman, a manager of a hunting equipment store, also testified that in May 2011, appellant's father bought a .40 caliber Smith and Wesson semi-automatic handgun.

Detective Maffei also examined appellant's Facebook page. According to Maffei, the page disclosed several photographs of appellant and the statement: "Is back in the hood, up to no good, were [sic] are those haters at? Miss my boy James, in time, in time. They will get there's [sic]."

B. *Defense Evidence*

Appellant testified that he and Dominguez were close friends, and that he believed that Lopez had murdered Dominguez. Appellant had known Lopez for approximately five years prior to the murder, which occurred at a gas station in May 2011. On one occasion, Lopez threatened appellant and Dominguez at a party, and on two other occasions, Lopez displayed a gun to appellant. Furthermore, although appellant was not present when Dominguez was killed, a gas station attendant had told him that Lopez killed Dominguez.

Appellant further testified that on August 27, 2011, at approximately 3:30 p.m., he drove from his home to visit his friend Ricky White, who lived on Dolores Street. Appellant had a handgun that his father had bought for appellant's self-protection. He became alarmed when a red Challenger began following him, as Dominguez had been killed by gunshots from a red Challenger. Appellant later saw that Lopez was driving the Challenger.

Appellant further testified that when he turned left at an intersection, Lopez made a sharper left turn and pulled alongside appellant. Appellant saw that Lopez had a gun, braked sharply, and moved behind Lopez's car. Although fearful of Lopez, appellant continued to drive behind Lopez, maneuvering as needed to prevent Lopez from having a clear line of fire at him. As he and Lopez approached White's house, Lopez turned into a church parking lot and pointed his gun at appellant. Appellant stopped his car, ducked, and fired his own gun six times. According to appellant, he had no intent to kill Lopez, and acted solely in self-

6

defense. Because Lopez's car was rolling backward toward appellant's car, appellant sped away.

C. *Rebuttal*

Officer Hitanukulkit testified that only six .40 caliber Smith and Wesson bullet casings were found at the scene of the shooting, and that no gun was recovered from Lopez or his car.

**DISCUSSION**

Appellant contends that the trial court made erroneous evidentiary rulings during the trial, and that defense counsel rendered ineffective assistance during the preliminary hearing and the trial. He also asks that we independently examine the transcript of the in camera hearing regarding the Dominguez murder investigation for hitherto undisclosed *Brady* material. As explained below, we see no reversible error, and our independent review of the in camera hearing has revealed no new evidence subject to disclosure.

A. *No Error in Evidentiary Rulings*

Appellant contends the trial court's evidentiary rulings contravened his rights of due process and confrontation under the United States and California Constitutions. He argues that the court erred in limiting his cross-examination of Lopez regarding the Dominguez murder investigation, and barring him from presenting evidence that Lopez was a suspect in that investigation. He maintains those rulings impaired his affirmative defense of self-defense and his ability to impeach Lopez. For the reasons discussed below, we reject his contentions.

7

1. *Governing Principles*

The trial court's determinations of relevance under Evidence Code section 351 are reviewed for abuse of discretion (*Spolter v. Four-Wheel Brake Serv. Co.* (1950) 99 Cal.App.2d 690, 699), as are its determinations under Evidence Code section 352 regarding whether "the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125).[2] Generally, that discretion permits the court to control the cross-examination of witnesses (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 118) and the presentation of impeachment evidence (*People v. Riccardi* (2012) 54 Cal.4th 758, 808-809 (*Riccardi*)).

Absent an abuse of discretion, the exclusion of evidence under sections 351 and 352 ordinarily contravenes no constitutional rights. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1249 (*DeSantis*); *Riccardi*, *supra*, 54 Cal.4th at p. 809.) "The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights." (*Riccardi*, *supra*, at p. 809; *DeSantis*, *supra*, 2 Cal.4th at p. 1249.) Furthermore, "'[t]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. [Citation.]' [Citations.] The Confrontation Clause allows 'trial judges . . . wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.' [Citation.]" Thus, a trial court may properly restrict cross-examination on the basis of sections 351 and 352. (*People v. King* (2010) 183 Cal.App.4th 1281, 1314-1315; *DeSantis*,

---

[2] All further statutory citations are to the Evidence Code, unless otherwise indicated.

*supra*, 2 Cal.4th at p. 1249.)

In view of these principles, our focus is on whether the court abused its discretion in limiting appellant's efforts to support his theory of self-defense and to impeach Lopez. As we elaborate below (see pt. A.2.c., *post*), appellant offered a theory of "perfect" self-defense founded on his testimony that he shot at Lopez only because he reasonably believed Lopez was about to shoot him. In support of that theory, appellant sought to question Lopez regarding the Dominguez murder investigation, and introduce evidence that Lopez had been a suspect in that investigation.

Generally, reasonable or "perfect" self-defense constitutes a complete exoneration from the crimes alleged against appellant, namely, attempted murder and shooting into an occupied motor vehicle. (See *People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1346.) The defense "does not depend upon the existence of actual danger, but rather depends upon appearances . . . ." (*People v. Clark* (1982) 130 Cal.App.3d 371, 377, abrogated on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) To establish the defense, the defendant need only show that he had "an honest and reasonable belief in the need to defend himself . . . ." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168 (*Rodarte*).)

In contrast, unreasonable or "imperfect" self-defense ordinarily operates merely to reduce attempted murder to attempted voluntary manslaughter (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833-834; see *Rodarte*, *supra*, 223 Cal.App.4th at p. 1171 [imperfect self-defense does not shield defendant from liability for offense of shooting from a motor vehicle (Pen. Code, § 26100, subd. (c)].) "One acting in imperfect self-defense . . . actually believes he must defend himself from imminent danger of death or great bodily injury; however, his belief is unreasonable." (*People v. Randle* (2005) 35 Cal.4th 987, 994, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

9

As we elaborate below (see pt. A.2. *post*), appellant also sought to cross-examine Lopez regarding the Dominguez murder investigation in order to discredit Lopez's testimony, which was a key element of the prosecution's case against him. Generally, subject to the trial court's discretion under section 352, witnesses may be impeached with evidence that they committed uncharged crimes of moral turpitude, a category that includes murder (*In re Kelley* (1990) 52 Cal.3d 487, 494; *People v. Lepolo* (1997) 55 Cal.App.4th 85, 89-92). In addition, to determine the credibility of a witness, the trier of fact may consider the witness's biases and motives in testifying, and veracity with respect to collateral factual matters. (§ 780, subds. (f), (i).) Under section 352, the trial court has the discretion to admit or exclude evidence offered for impeachment with respect to those subjects. (*People v. Pearson* (2013) 56 Cal.4th 393, 455 (*Pearson*); *People v. Mayfield* (1997) 14 Cal.4th 668, 748.)

### 2. *Underlying Proceedings*

#### a. *Brady Hearing*

In August 2012, at appellant's request, the trial court examined the Los Angeles Police Department's "murder book" regarding Dominquez for specified *Brady* material, namely, evidence linking Lopez to that murder. Following the examination, the court ordered the disclosure of a single report containing statements from a confidential informant, with redactions to protect the informant's identity.

#### b. *Rulings Prior to the Presentation of Evidence*

On April 3, 2013, during jury selection, the trial court conducted a hearing on appellant's request for leave to cross-examine Lopez regarding the report disclosed at the *Brady* hearing (§ 402). According to the report, the confidential

informant stated that Dominguez's murder was carried out by an individual named "David" who was driving a red car similar to Lopez's Challenger. When the trial court remarked that "David' was a common name and red Challengers were common cars, the following discussion occurred:

"[Defense counsel]: True, but not within the realm of Wilmington . . . . [The c]onfidential informant . . . told the police that Andrew, David's brother, copped to [*sic*] that David and Andrew were involved in . . . Dominguez's demise . . . .

"The Court: . . . So you are saying that a confidential informant named David Lopez as involved in a homicide?

"[Defense counsel]: Yes."

Defense counsel acknowledged that Lopez had never been charged with that murder, but argued that he should be permitted to cross-examine Lopez regarding it, as Lopez's testimony was essential to the prosecution's theory of the case, namely, that appellant's crimes were an attempted "revenge killing."[3]

Although the prosecutor maintained that the proposed cross-examination was irrelevant to the issues in the case, he acknowledged that he planned to elicit some testimony from Lopez regarding the Dominguez murder investigation, namely, that Lopez was never arrested for that murder, although police officers

---

[3]    Defense counsel also asked the trial court to disclose the confidential informant's name, stating that his private investigator had tracked down the person most likely to be the informant and discovered that he was dead. The trial court ruled that the request for the informant's identity was untimely. Nonetheless, the court asked the prosecutor to meet with police investigators during the lunch break and confirm whether the informant was dead. The upshot of that inquiry is not expressly reflected in the record, as there was no discussion regarding the informant after the lunch break, but defense counsel never again sought the informant's identity. Because appellant does not challenge the ruling that his request for the informant's identify was untimely, he has forfeited any contention of error regarding it.

11

questioned him concerning it. When the trial court noted that Lopez's testimony on those subjects might open the door to defense counsel to examine Lopez regarding his potential role in the murder, the prosecutor stated that he would forego questioning Lopez regarding the Dominguez murder investigation, and instead establish appellant's motive for shooting at Lopez solely through appellant's remarks on his Facebook page.

Following that remark by the prosecutor, the trial court asked defense counsel to explain why the report of the informant's remarks would be admissible over a hearsay objection. Defense counsel argued, inter alia, that he intended to show that Lopez had threatened appellant and Dominguez, and "stalk[ed]" appellant. The following colloquy then occurred:

"The Court: I understand that. But as far as bringing in . . . Dominguez's death, I am not going to have a trial within a trial unless you could make a proffer, you could connect the dot[s].

"[Defense counsel]: . . . [I]f [the prosecution] . . . open[s] the door just a crack, I am going to pretty much want to take it.

"The Court: If they open up the door, then you could certainly rephrase the issue, but without [a] proffer of how Dominguez's . . . homicide[] can be linked to this case[] with evidence that can actually be admitted, without that, on [section] 352 . . . . [¶]

"[Defense counsel]: I don't see how [the prosecution] can avoid raising Dominguez's death as the motivation for my client . . . .

"The Court: Sure[] they can. [Appellant] could have been mistaken. The state of mind of your client has nothing to do with Dominguez's homicide other than Dominguez was killed. . . ."

Later, the trial court and the parties addressed the extent to which appellant's Facebook entries were admissible. In the course of their discussion, defense

12

counsel suggested that the prosecution had decided not to refer to Dominguez at all. The court replied: "No, that's not the ruling. [¶] . . . [¶] The ruling is [that] they could use that as a motive, but if they are going to get into the facts of the case, then that's a different issue."

The court explained its prior ruling, stating: "I am not going to allow parties to ask . . . Lopez about . . . Dominguez's homicide . . . unless you could [show] . . . that he, in fact, was [a] participant [in] that particular crime. . . . [¶] . . . [¶] The ruling is that you can't talk about . . . Dominguez, but if you want to talk about, did . . . Lopez kill . . . Dominguez[?], . . . there has to be [a] proffer of evidence. So far I [have] heard three: One, . . . Lopez drives a similar type of car . . . .; two, somebody said that James [*sic*] Lopez may have been involved; and three, there was someone [who] said David may be involved. [¶] . . . [¶] So, if that is it, . . . that's not [a] sufficient showing that linkage has been shown. . . . [I]t is an impeachable offense, but before you could do that you have to make a proffer to the court that you have evidence to link [him] up to that particular charge. And if that is made, then we have other issues that we need to discuss at that point, but we are at step number one first, we have to have linkage."

Shortly before opening statements, the prosecutor asked the court whether his presentation of evidence that Lopez was a suspect in the Dominguez murder investigation would permit defense counsel to examine Lopez regarding his role in that murder. At the same time, defense counsel inquired whether he would be permitted to ask Lopez whether the police had interviewed him regarding Dominguez's death. The court replied that "[w]hether or not . . . Lopez was involved in the death of . . . Dominguez" was not going to be presented unless the defense made an adequate proffer of evidence linking Lopez to that crime, which defense counsel had not then done. Pointing to section 352, the court stated: "I'm

13

not going to have a trial within a trial without sufficient evidence to impeach [Lopez]."

In response, defense counsel stated that he planned to present an affirmative defense based on self-defense, and intended to rely on Lopez's status as a suspect in the Dominguez murder investigation to show appellant's "reasonable belief." The following colloquy then occurred:

"The Court: Okay. . . . [W]hether or not . . . Lopez was investigated by the police about the death of . . . Dominguez, what's the relevancy?

"[Defense Counsel]: Because if he was afraid of . . . Lopez, if . . . Lopez had made threats against him and . . . Dominguez.

"The Court: If your client has -- if his testimony is, . . . I was threatened by . . . Lopez, that's admissible. If your client was present where . . . Dominguez was threatened, that's admissible. But obviously, hearsay, all other evidentiary rules apply.

"[Defense Counsel]: Understood, your honor."

### c. *Rulings During the Presentation of Evidence*

In examining Lopez, the prosecutor asked no questions regarding Dominguez, the investigation of his murder, or Lopez's discovery of appellant's Facebook page. On cross-examination, over the prosecutor's objections, the trial court permitted to Lopez to testify that he knew of Dominguez, and never threatened him. The court sustained the prosecution's objections to all other questions defense counsel posed to Lopez regarding Dominquez, and to an inquiry whether Lopez's conviction for carrying a concealed weapon was his "only law enforcement contact." After defense counsel inquired regarding Lopez's discovery of appellant's Facebook page, the prosecutor addressed that subject during his re-direct examination of Lopez.

Later, in examining Detective Maffei, the prosecutor sought to present the contents of appellant's Facebook page, including appellant's remark, "Miss my boy James . . . . They will get there's [*sic*]." Defense counsel objected to the prosecutor's questions, stating: "If he brings this in, this will bring in the whole . . . Dominguez issue . . . ." The trial court replied, "Goes to motive . . . ." Defense counsel asked, "If [the prosecutor] brings in [']James['], can I go into James Dominguez then?," and explained that he intended to do so in order to establish why appellant needed a gun for self-protection. The court responded: "Well, that's [a] different issue. If you want to bring that up, we could do [an Evidence Code section] 402 motion so you could make [an] argument as to why I should allow your client to testify about that particular person." The court then overruled defense counsel's objection to Detective Maffei's testimony regarding the Facebook page.

After the prosecution completed its case-in-chief, the trial court asked defense counsel to raise his "402 issues." Defense counsel stated: "[It s]eems that we are going to get into the James Dominguez issue. And the court ruled on a prior 402 [motion] that I was going to be precluded from exploring that area." The court replied: "My ruling was that particular area could not be [gotten] into with . . . Lopez unless there was a proffer . . . ." When the court asked whether the prosecutor intended to object to testimony from appellant regarding Dominguez, the prosecutor answered that he had none to testimony that Lopez had threatened appellant and Dominguez. The court remarked that if appellant planned to testify regarding self-defense, appellant could properly describe his "impression" of Lopez's conduct.

After that remark, defense counsel asked whether he would be permitted to question the police investigator assigned to Dominguez's murder regarding his contacts with Lopez. The following colloquy then occurred:

15

"The Court: No. What's the relevancy of that? It goes to the state of mind of your client. [Appellant] doesn't know anything about what police investigation is ongoing. So what happened with the police investigation is irrelevant as to what your client's state of mind is. . . . Because . . . self-defense goes to [the] state of mind of your client.

"[Defense counsel]: That's true. [¶] . . . [¶] But it has to be reasonable, and if the police are running a parallel or they are running along --

"The Court: Reasonable based on what your client knew, not reasonable based on what is going on . . . . [¶] If you could lay the foundation that your client was at the police station with the detectives, . . . so he had detailed information about the police investigation of [the] murder . . . , clearly that comes in. But if he has no knowledge, . . . he could only testify as to what he personally saw and heard. That's it."

Defense counsel then stated that he had planned on "a . . . Dominguez-free trial" because he had misconstrued the court's earlier ruling. In response, the court again explained that references to Dominquez were not necessarily precluded by its ruling, which directed only that Lopez could not be questioned regarding Dominguez's murder absent an offer of proof linking Lopez to that crime. The court stated: "[A]s to other issues about self-defense, . . . I did not make any ruling on that."

### d. *Subsequent Proceedings*

Appellant testified that he shot at Lopez in self-defense because Lopez pointed a gun at him. Regarding his state of mind at the time, appellant testified that prior to Dominguez's murder, Lopez had threatened appellant and Dominguez, and also displayed a gun to appellant; that appellant knew Dominguez's murderer

16

drove a red Challenger; and that a person who worked at the scene of the murder had told him Lopez killed Dominguez.

Following the presentation of evidence, the jury received instructions on perfect and imperfect self-defense. During closing arguments, defense counsel urged the jury to find appellant not guilty because he acted in self-defense. The jury found appellant not guilty of attempted murder, but guilty of attempted voluntary manslaughter and shooting at an occupied motor vehicle.

3. *Analysis*

Appellant contends the trial court's evidentiary rulings improperly "hamstrung" his defense by "erect[ing] a broad 'no fly zone'" barring cross-examination of Lopez regarding the Dominguez murder investigation and Lopez's role in that crime. We disagree. As explained below, to the extent appellant sought to introduce evidence regarding those subjects -- through the cross-examination of Lopez or in some other manner -- in order to establish his theory of perfect self-defense, the court correctly determined that evidence of the police investigation was irrelevant to appellant's state of mind when he shot Lopez. Furthermore, to the extent appellant sought to introduce evidence regarding Lopez's suspected or actual involvement in Dominguez's murder to impeach Lopez as a witness, the court did not abuse its discretion by requiring an offer of proof adequately linking Lopez to Dominguez's murder, which appellant never provided.[4]

---

[4]  In a related contention, appellant suggests that the trial court improperly hamstrung his defense by permitting the prosecution to rely on his Facebook page to establish his motive for the shooting. As he offers no argument to support that contention, he has forfeited it. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

17

To begin, the trial court properly limited appellant's evidence and cross-examination of Lopez, insofar as they were intended to establish appellant's claim of perfect self-defense. Generally, that defense hinges on "the appearance of imminent peril to the person attacked," not on "the existence of actual danger . . . ." (*People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201-202.) As our Supreme Court has explained, the crucial inquiry is whether "the defendant acted *reasonably* under the circumstances," not whether "the victim 'deserved' what he or she got." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1068.) Furthermore, "[r]easonableness is judged by how the situation appeared to the defendant, not the victim." (*Ibid*., italics deleted.)

Here, the trial court accurately specified the offer of proof needed to show the relevance of the Dominguez murder investigation to appellant's theory of perfect self-defense, but appellant made no such offer. Furthermore, appellant's testimony showed that he did not witness Dominguez's murder, and that he had no personal knowledge of the investigation, including whether officers regarded Lopez as a suspect. The court thus correctly barred evidence and cross-examination regarding any facts concerning the Dominguez murder and its investigation that were beyond appellant's personal awareness, including whether Lopez had killed Dominquez or been investigated by the police.

The trial court also properly limited appellant's evidence and cross-examination of Lopez, insofar as they were intended to impeach Lopez. Although the record does not specify appellant's precise challenge to Lopez's credibility, it appears that he sought to show that Lopez had committed an uncharged crime of moral turpitude, or alternatively, to rely on Lopez's participation in that crime to discredit Lopez's testimony that he never threatened Dominguez or appellant. However, regardless of appellant's theory of impeachment, the trial court acted well within its discretion in requiring -- at a minimum -- an adequate offer of proof

18

that Lopez, in fact, participated in Dominguez's murder. (See *Pearson*, *supra*, 56 Cal.4th at pp. 454-456 [trial court properly denied defendant leave to cross-examine prosecution witness regarding fraud charges against witness that had been dismissed, as defendant offered no proof that the witness had committed fraud]; *People v. Sapp* (2003) 31 Cal.4th 240, 289-290 [trial court properly precluded defendant's cross-examination of prosecution witness regarding unproven fraud charges]; *People v. Stone* (1983) 139 Cal.App.3d 216, 224-225 [trial court properly limited defendant's cross-examination of police officers intended to show they falsely testified regarding their grounds for search, as defendant's proffered evidence regarding testimony's falsity supported only speculation].) Nor is appellant's offer of proof regarding Lopez's involvement in Dominguez's murder -- that Dominguez's killers drove a red car similar to Lopez's Challenger, and that a confidential informant reported that appellant's brother had "copped to" appellant being one of the murderers -- reasonably regarded as adequate.

Appellant maintains that the trial court's rulings improperly prevented him from dispelling the "impression" created by Lopez's testimony, namely, that "[he] was the unwitting victim of a senseless and unprovoked shooting with no previous bad blood toward appellant and Dominguez." He argues that had he been permitted to cross-examine Lopez regarding his role in the Dominguez murder, the jury would probably have seen Lopez invoke his privilege against self-incrimination, and thereby conclude that Lopez's testimony was not credible. However, the evidence that appellant offered to support the proposed cross-examination -- the evidence noted above, coupled with the fact that police officers talked to Lopez regarding Dominguez's murder -- was manifestly insufficient to show either that Lopez participated in that crime or that Lopez provoked appellant to shoot him. Furthermore, "'[t]he jury may not draw any inference from a witness's invocation of a privilege.'" (*Pearson*, *supra*, 56 Cal.4th at p. 456; § 913,

19

subd. (a).) In view of appellant's meager offer of evidence and the likelihood that the proposed cross-examination would require a time-consuming inquiry into Dominguez's murder, the trial court did not abuse its discretion in requiring appellant to "connect the dot[s]" between Lopez and that crime.

Appellant's reliance on *Davis v. Alaska* (1974) 415 U.S. 308 (*Davis*) and *Delaware v. Van Arsdall* (1986) 475 U.S. 673 (*Van Arsdall*) is misplaced. In *Davis*, the defendant was charged with a burglary involving the theft of a safe. (415 U.S. at pp. 309-311.) The key prosecution witness was a juvenile, who testified that he saw the defendant near where the abandoned safe was found. (*Id*. at pp. 309-310.) Although the juvenile was on probation for burglary, the trial court barred the defendant from cross-examining him regarding whether his probation had motivated him to make an ill-founded identification of defendant, either because he hoped to shift suspicion away from himself, or because the police had applied undue pressure to him. (*Id*. at p. 311.) The United States Supreme Court held that the ruling contravened the defendant's confrontation rights, as it prevented him from raising a significant inference of witness bias. (*Id*. at pp. 316-321.)

For the reasons discussed above, the limitation on appellant's cross-examination of Lopez imposed no similar constraint on his ability to establish his theory of self-defense or challenge Lopez's credibility. Because appellant admitted that he shot at Lopez, his focus at trial was on the reasonableness of his state of mind when he fired at Lopez. However, appellant failed to show that his proposed cross-examination was relevant to that issue. Furthermore, because appellant made no adequate offer of proof that Lopez murdered Dominguez, the limitation of appellant's cross-examination did not deny him a material challenge to Lopez's credibility.

In *Van Arsdall*, the defendant was charged with murder. (*Van Arsdall, supra,* 475 U.S. at p. 674.) Prior to the trial, one of the prosecution witnesses agreed to speak to the prosecutor regarding the murder in exchange for the dismissal of a pending drunk driving charge against the witness. (*Id.* at p. 676.) At trial, the court barred the defendant from cross-examining the witness regarding that agreement. (*Id.* at pp. 679-680.) The United States Supreme Court concluded that the ruling contravened the defendant's confrontation rights because it denied him the opportunity to show "a prototypical form of bias on the part of the witness . . . ." (*Id.* at p. 680.) As explained above, that is not the case here. In sum, appellant has shown no error in the trial court's evidentiary rulings regarding the Dominguez murder and its investigation.

### B. No Ineffective Assistance of Counsel

Appellant contends his defense counsel rendered ineffective assistance during the preliminary hearing and at trial. Regarding the preliminary hearing, appellant maintains that defense counsel improperly failed to defeat the prosecutor's objection to Lopez's testimony that there was a gun in his car when appellant shot him. Regarding the trial, appellant maintains that defense counsel improperly failed to confront Lopez with his preliminary hearing statement. Appellant further argues that counsel's conduct impaired his theory of self-defense at trial, as it prevented appellant from corroborating his own testimony that he saw Lopez holding a gun, and from impeaching Lopez's trial testimony. As explained below, appellant has failed to show ineffective assistance of counsel.

"In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's

21

performance or lack thereof.  [Citations.]  Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'  [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 357.)

### 1. *Preliminary Hearing*

We begin with appellant's contention regarding the preliminary hearing. Lopez was the sole witness called at the preliminary hearing.  On direct examination, he testified that appellant followed him to the church parking lot, where appellant fired a gun at him.  During the cross-examination, after questioning Lopez regarding the shooting, defense counsel asked Lopez several questions related to whether he saw appellant's photograph before he identified appellant in a photographic line-up.  The following colloquy then occurred:

"Q.  [by defense counsel]:  Isn't it a fact that you had a firearm in your car?

"A.  I believe I did.

"[Prosecutor]:  Objection; relevance.

"[Lopez]:  But --

"The Court:  Sustained.  The answer is stricken.  Having it in his car is not relevant.

"[Defense counsel]:  No further questions, your honor."  Shortly afterward, when the prosecutor completed his brief re-direct examination of Lopez, defense counsel told the court that he intended to offer no affirmative defense.  Later, at trial, appellant was the only witness who testified that Lopez pointed a gun at him before he shot at Lopez.

Appellant challenges defense counsel's tactics at the preliminary hearing, maintaining that counsel "failed to argue for, or offer to prove, the manifest

22

relevance . . . of Lopez's admission of having . . . a gun . . . to [his] affirmative defense of reasonable self-defense." Generally, regarding such decisions, ineffective assistance is not shown "when the record does not establish why counsel . . . failed to act in the manner challenged, unless counsel was asked at trial for an explanation and failed to provide one, or unless there could be no satisfactory explanation." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1037.) This is because ineffective assistance is demonstrated only when counsel's acts cannot be explained on the basis of any knowledgeable choice of tactics. (*People v. Shoals* (1992) 8 Cal.App.4th 475, 501.) Accordingly, the key issue is whether the record affirmatively shows that defense counsel contravened professional norms by failing to establish the relevance of Lopez's admission.

In our view, the record does not do so. To begin, defense counsel cannot be faulted for refraining from trying to show the "manifest relevance" of Lopez's statement to appellant's theory of self-defense by reference to Lopez's prior testimony. Lopez's brief statement in no way suggested that at the time appellant shot him he was holding a gun, much less pointing it at appellant. Indeed, nothing in Lopez's testimony suggested that he provoked the shooting or displayed any weapon to appellant. Because the testimony preceding Lopez's statement regarding the gun afforded defense counsel no reasonable basis to argue that appellant acted in self-defense, defense counsel properly declined to make that argument. (*People v. Price* (1991) 1 Cal.4th 324, 387 [counsel does not render ineffective assistance by failing to offer arguments that counsel reasonably determines would be futile].)

The focus of our inquiry, therefore, is on whether defense counsel erred in making no offer of proof to show the relevance of Lopez's admission. Because appellant was the sole witness presented at trial to support his theory of self-defense, it appears that any such offer of proof at the preliminary hearing would

23

have required defense counsel to call appellant as a witness. However, "[a]dvising [a criminal defendant] not to testify does not in and of itself constitute inadequate . . . assistance," as it ordinarily represents a tactical decision for which there can be many good reasons, including a desire to shield the defendant from potentially damaging cross-examination. (See *People v. Trotter* (1984) 160 Cal.App.3d 1217, 1221-1225.) Accordingly, appellant has failed to show that his counsel rendered ineffective assistance at the preliminary hearing.

### 2. *Trial*

We turn to appellant's contention regarding the trial. Appellant argues that defense counsel's failure to seek to confront Lopez with his "inconsistent" preliminary hearing statement or to offer it into evidence constituted deficient representation. Generally, a witness's prior inconsistent statements may be admitted for impeachment purposes and as substantive evidence, provided the witness is afforded an opportunity to explain them. (*People v. Brown* (1995) 35 Cal.App.4th 1585, 1596-1597; §§ 770, 1235.) Such statements need not have been testimony admitted into evidence at a prior hearing. (*People v. Ochoa* (2001) 26 Cal.4th 398, 445, abrogated on another point by *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14; see *People v. Corella* (2004) 122 Cal.App.4th 461, 470-472 [testimony striken at preliminary hearing was admissible at trial for impeachment purposes under section 1202].)

Here, the record does not establish that defense counsel lacked a satisfactory basis for failing to confront Lopez with his preliminary hearing statement. At trial, Lopez acknowledged that he had bought a gun for self-protection a month after the shooting, but was too young to register it, and suffered a conviction for carrying it as a concealed weapon. Thereafter, in response to defense counsel's question, "Isn't that when you leveled the gun at [appellant]?" Lopez responded, "No. I

never had no gun." Lopez's response was clearly intended to refute defense counsel's assertion that he had "leveled the gun" at appellant. Despite the use of the word "never," Lopez could not reasonably have intended to suggest he had never owned a gun, as he previously testified to having done so.

Furthermore, regardless of whether the preliminary hearing statement was admissible as an inconsistent prior statement, defense counsel may reasonably have refrained from attempting to examine Lopez regarding it. The transcript of the preliminary hearing discloses that defense counsel's question regarding the gun occurred after he had examined Lopez concerning certain events following the shooting, and that the question itself did not specify the relevant time frame for the presence of the gun. Lopez replied to the question in the affirmative and began to elaborate his answer, but was prevented from doing so by the prosecutor's objection, sustained by the court with the observation that the mere presence of a gun in the car was irrelevant. Defense counsel may thus have concluded that Lopez would explain his preliminary hearing statement, either by stating that he had referred to the gun bought after the shooting, or by offering another explanation consistent with his trial testimony that he in no way provoked appellant by pointing a gun at him.

We also see no prejudice from defense counsel's failure to challenge Lopez with his preliminary hearing statement. Because appellant acknowledged that he shot at Lopez, the key factual issue at trial was whether Lopez pointed a gun at him, not whether Lopez had a gun in his car. Appellant's testimony was not that he fired his gun at Lopez because he saw a gun in Lopez's car or that he saw Lopez reach for what he believed was a gun; rather, it was that he shot Lopez because Lopez was aiming a gun at him. According to appellant's testimony, he saw Lopez's gun before he followed Lopez on Dolores Street, but shot at Lopez in self-defense only when Lopez pointed his gun at him. Thus, even an acknowledgment

25

from Lopez that he had a gun somewhere in his car would not have materially supplemented appellant's testimony that he shot Lopez in self-defense. In sum, appellant has failed to show that his counsel rendered ineffective assistance.

C. *No Undisclosed Brady Material*

At appellant's request, we have examined the transcript of the in camera hearing on the Dominguez "murder book," and determined that it identifies no hitherto undisclosed *Brady* material subject to disclosure.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:



WILLHITE, Acting P. J.



EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.