Filed 5/26/15  Oliphant v. Shah CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| WELSEY D. OLIPHANT, et al, <br><br>    Cross-complainants, Cross-defendants and Appellants, <br><br>      v. <br><br> SURESH SHAH, Individually and as Trustee, etc., <br><br>    Cross-defendant, Cross-complainant and Appellant. | G050693 <br><br> (Super. Ct. No. INC080090) <br><br> O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Randall D. White, Judge.  Affirmed in part, reversed in part, remanded.

Snell & Wilmer and Todd E. Lundell for Cross-defendant, Cross-complainant and Appellant.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Lann G. McIntyre; Nethery/Mueller/Olivier and Martin A. Mueller for Cross-complainants, Cross-defendants, and Appellants.

\*　　　\*　　　\*

This is an appeal from a judgment in favor of Wesley D. Oliphant, Evan Matzner, and Tuscany Heights, LLC (Tuscany) (collectively plaintiffs)[1] by defendants Suresh Shah and the Shah Family Trust (collectively defendants) over the fallout from a real estate financing venture. The jury found in favor of plaintiffs on various legal claims and awarded approximately $858,000 in damages. The court, ruling on various equitable claims, increased the damages to approximately $1.2 million and awarded attorney fees and costs, for a total judgment exceeding $1.6 million.

Defendants argue various errors at trial, one of which would require outright reversal on all claims if we agreed with their arguments. They claim the court should have granted their motion for judgment notwithstanding the verdict because each of plaintiffs' claims was improperly based on parol evidence. We disagree, because the agreements in question were only partially integrated, and plaintiffs advanced a meaning to which the agreements were reasonably susceptible.

Alternatively, defendants contend other errors require a new trial or change in the judgment. With respect to the jury verdict, defendants claim impeachment evidence unfairly influenced the jury and the special verdict form was ambiguous. We find no merit in either of these contentions and affirm the jury verdict.

With regard to the equitable cause of action for implied contractual indemnity, defendants argue the statement of decision is inadequate, despite their requests for clarification. We agree and therefore reverse on this claim, and remand for further proceedings. We must, accordingly, also therefore direct the trial court to reconsider the amount of attorney fees awarded.

---

[1] Technically, the parties are cross-complainants and cross-defendant, as we will explain shortly. But for the sake of simplicity and the ease of the reader, we refer to them as plaintiffs and defendant.

Finally, in a cross-appeal, plaintiffs argue the court should have awarded prejudgment interest under Civil Code section 3287. We conclude the trial court did not err in denying plaintiffs' motion for prejudgment interest.

I

FACTS

In 2003, Oliphant, Matzner and an additional investor[2] formed Tuscany for the purpose of developing eight acres of real estate in Palm Springs. They executed an operating agreement accordingly. In 2007, Tuscany borrowed $10.3 million from Vineyard Bank (Vineyard) to construct the lots and build three model homes, which were completed the same year. Both Oliphant and Matzner personally guaranteed the loan. The loan was due by April 2008.

Tuscany defaulted on the loan, and in August and September 2008, respectively, Vineyard filed complaints to foreclose on the property and to collect from Oliphant and Matzner on their guaranties. After those lawsuits were filed, Oliphant and Matzner negotiated with Vineyard to extend the loan in exchange for a partial payment and additional collateral. Negotiations continued for some time, and documents were prepared.

The extension was not executed, however, because Oliphant and Matzner began negotiating with Suresh Shah, an acquaintance of Oliphant's, toward late 2008. Shah was interested in purchasing an office building Vineyard owned, and Oliphant suggested the best way to get the bank's attention was to make an offer on a package of multiple properties. They eventually agreed to offer Vineyard $9 million in cash both to purchase the building and to satisfy the Tuscany loan. Oliphant wrote his proposal to the bank in an e-mail, introducing Shah as a "substantial net worth individual" and proposed

_____

[2] This investor dropped out of the project in 2005 or 2006.

3

the $9 million cash offer. Shah reviewed this e-mail before it was sent, telling Oliphant it was "a perfect letter."

The bank counteroffered with $10 million. Shah and Oliphant had already agreed that $10 million was the likely purchase price. Oliphant went to Shah's house to celebrate. But at that time, Shah dropped what Oliphant described as "a bomb," by telling Oliphant he did not have the $10 million in cash. Shah did not want to take the money out of an investment account, so he said he would ask his own bank, California Bank & Trust, for a loan instead. Oliphant and Shah met there the next day, but California Bank & Trust eventually turned Shah down, pointing out, among other things, that Shah needed to clean up a revolving $3 million line of credit he already had with the bank. Shah also approached several friends, who were ultimately uninterested in investing.

Around this time, Oliphant also approached El Paseo Bank (El Paseo) seeking to borrow an additional $3 million. He sent an e-mail, copied to Shah, stating that Shah would be the borrower, Shah's collateral would be another piece of real property, Shah would personally guaranty the loan, and Tuscany's ownership would be divided between Shah and Oliphant 70/30.

Shah then suggested asking Vineyard to loan them $6 million. Vineyard instructed Oliphant to get Shah's financials, which would then be reviewed by a committee. Shah provided financial statements and other information, and Oliphant put together a balance sheet based on this information showing Shah had a net worth over $66 million. Vineyard agreed, but increased the purchase price to $10.25 million. Shah was able to negotiate a lower interest rate.

The deal the parties reached would result in Shah becoming a majority owner of Tuscany, purchasing the office building and buying out Vineyard's note. Two agreements were prepared: a purchase and sale agreement (PSA) between Tuscany and

4

Vineyard, which Shah joined separately, and a first amendment to the operating agreement of Tuscany, signed by Oliphant, Matzner and Shah. The final version of the first amendment was prepared by Oliphant and Shah, not their attorneys.

While the negotiations were proceeding, Shah informed Oliphant on December 12 or 13 that he would be in India for the rest of the month. According to Oliphant, they came up with the idea of including Tuscany as the borrower on the loan so that Oliphant could sign the loan documents in Shah's absence. Shah gave his assistant full authority to act as his agent.

The PSA, dated December 26, 2008, specified that Tuscany would purchase the office building and would also satisfy Vineyard's prior note. Vineyard would then make a new loan to Tuscany to finance the purchase price, "guaranteed by Suresh Shah." Shah would become the majority owner in Tuscany. Escrow was to close on or before January 9, 2009.

At the time the PSA was signed and according to its terms, Oliphant and Shah each deposited $250,000 into escrow. In the event the deal did not close, the funds would be applied toward the principal on the outstanding note.

Shah also signed a separate joinder. The joinder declared that Oliphant and Matzner agreed to assign Shah a majority of Tuscany upon closing, and that Tuscany "will continue to be obligated under the [PSA] subsequent to such assignment of the ownership interests . . . ."

The first amendment, signed on January 7, 2009, conveyed Matzner's entire 50 percent interest to Shah, along with a 30 percent interest from Oliphant. Recital F stated Oliphant and Shah would recapitalize Tuscany for the purpose of inducing Vineyard to convey the office building and to reconvey the Tuscany property. The same provision specified the money for the purchase would come from several sources, including the $6 million loan set forth in the PSA, which would be "guaranteed by

5

[Shah]." The funds would also come from the El Paseo loan "to [Tuscany] . . . secured by collateral owned and guaranteed by [Shah]."

Paragraph 6 of the first amendment discussed company lines of credit. It stated: "The Company shall obtain two loans . . . a six million dollar . . . and a three million dollar . . . secured line[] of credit, which shall be personally guaranteed by [Shah]. The secured lines of credit, or whatever portion therof is needed, shall be used for the acquisition of a commercial building and the payoff of a promissory note as more fully identified in the PSA. However, [Oliphant], [Shah] and [Tuscany] agree that [Tuscany] shall be one hundred percent . . . liable and the primary Guarantor with borrower(s), etc, et al., for repayment of loan obligations of [Tuscany], on the real property to be conveyed by Vineyard . . . and for secured or unsecured lines of credit on any and all property of [Shah] and/or the Shah Family Trust securing [Tuscany] assets. It is acknowledged that the Lines of Credit and new loans will be the obligations of [Tuscany]. [Shah] and [Oliphant] personally guarantee any membership obligations they might have under the operating agreement to the LLC as amended herein."

On January 8, 2009, Shah, as managing member of Tuscany, signed the necessary documents for the company to borrow $6 million from Vineyard. Shah and Oliphant continued negotiations with El Paseo over the $3 million loan. Richard Davis of El Paseo informed Oliphant the loan had been approved with Shah's name as the borrower and his personal guaranty, with another property owned by Shah, Morningstar Plaza, as collateral. But El Paseo learned the Morningstar property was held by the Shah Family Trust, in addition to a number of title issues. The loan was, therefore, not ready to close by the required date of the PSA, January 9, but Vineyard was willing to extend the date.

On January 12, Shah went to El Paseo to sign the loan documents. He saw that El Paseo had prepared to make the Shah Family Trust the borrower rather than

Tuscany. He refused to sign for this reason. According to Davis, he understood that whomever owned the collateral was to be the borrower on the loan, and Shah had forwarded family trust documents to El Paseo.

According to Oliphant, Shah also said that his wife wouldn't sign the loan documents with respect to the trust. Oliphant asked El Paseo if they would reissue the loan documents with Tuscany as the borrower. The bank ultimately said it should not be a problem. But at that point, Shah went out of town, and, according to Oliphant, refused to take further steps to close the deal. He did not hear from Shah again until mid-February, when he sent Oliphant a fax stating he had backed out of the deal because Oliphant had been dishonest. He said he had never seen the PSA and Oliphant had concealed the $3 million loan was to Shah rather than Tuscany.

At that point, the deal was unsalvageable. Vineyard terminated the PSA for failure to close escrow. Oliphant subsequently revoked his resignation as managing member of Tuscany. Eventually, Oliphant and Matzner settled for $600,000.

While the litigation was still pending, however, plaintiffs cross-complained against Shah and the Shah Family Trust for Shah's refusal to perform under the first amendment by obtaining the El Paseo loan. Plaintiffs sued for breach of contract, fraud, negligent misrepresentation, implied contractual indemnity, and declaratory relief. Defendants cross-complained, stating 14 causes of action. The jury was asked to decide the breach of contract and fraud claims at trial.

At trial, the court bifurcated liability and damages, with the jury first deciding liability on the legal claims. The jury found for plaintiffs on their claims for breach of contract and negligent misrepresentation, and found against defendants on their claims. At the conclusion of the damages phase, the jury awarded plaintiffs $858,506.24.

The court then considered the equitable claim for implied contractual indemnity and increased plaintiffs' award to $1,208,566.20. The court subsequently

7

awarded attorney fees and costs to plaintiffs and denied defendants' motion to vacate the judgment and for judgment notwithstanding the verdict and also moved for a new trial. The court denied plaintiffs' request for prejudgment interest. Both parties now appeal.

II

DISCUSSION

*Judgment Notwithstanding the Verdict*

We address this issue first, because if defendants are correct and judgment notwithstanding the verdict should have been granted, we need not address the remaining issues. Defendants argue the first amendment was a fully integrated agreement, and under its terms, Tuscany would be the borrower and Shah was only the guarantor. Thus, the plaintiffs' contention that Shah should have borrowed the $3 million from El Paseo was inconsistent with the terms of the written agreement and in violation of the parol evidence rule. The trial court denied defendants' motion in limine on this point, concluding the first amendment was only partially integrated and was sufficiently ambiguous to allow evidence of a collateral agreement.

California's parol evidence rule is codified in section 1856 of the Code of Civil Procedure. Section 1856, subdivision (a) states: "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement." The parol evidence rule is a rule of substantive law that prevents the introduction of extrinsic evidence to vary, alter, or contradict the terms of a written agreement. (Code Civ. Proc., § 1856, subd. (a); *Gerdlund v. Electronic Dispensers International* (1987) 190 Cal.App.3d 263, 270.)

The operation of the parol evidence rule is a question of law when no evidentiary conflict exists. (*Consolidated World Investments, Inc. v Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 378.) Because the only question defendants ask us to rule on

8

here is the applicability of the parol evidence rule, we consider the question independently, rather than under the more deferential substantial evidence standard under which we generally decide a motion for judgment notwithstanding the verdict. (*Gunnell v. Metrocolor Laboratories, Inc.* (2001) 92 Cal.App.4th 710, 718.)

We begin with the question of whether the contract is integrated. An integration clause is one factor to consider; indeed, it is often determinative. (*Banco Do Brasil, S.A. v. Latian, Inc.* (1991) 234 Cal.App.3d 973, 1002-1003.) But other factors include: (1) whether the parol understanding on the subject at issue naturally might have been made as a separate agreement and; (2) "the circumstances at the time of the writing." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 953-954 (*Founding Members*).)

The original Tuscany operating agreement included an integration clause, although the first amendment does not. The integration clause states it is "the entire agreement between the members and supersedes all agreements, representations, warranties, statements, promises and understandings, whether oral or written, with respect to the subject matter hereof . . . ." But the integration clause itself creates something of an ambiguity by referring to superseding other agreements that had occurred prior to the effective date of the operating agreement, but not any future amendments. Although the first amendment states "[e]xcept as specifically modified herein, the Operating Agreement, as modified by this First Amendment, shall remain in full force and effect as though fully set forth herein, or as subsequently modified," that only begs the question as to whether the first amendment does, in fact, modify the integration clause.

But both recital F and paragraph 6 refer to other agreements, specifically, the loans that would be taken out in order to recapitalize and fund Tuscany. Additional loans equates to additional agreements. Therefore, separate agreements were certainly

9

contemplated that would involve both the parties and the various banks involved. Thus, given all of the surrounding circumstances, we cannot deem the first amendment and the operating agreement to be a fully integrated contract. It is, at best, partially integrated.

When a document is partially integrated, additional evidence of consistent additional terms is admissible to supplement or explain the agreement, but cannot be used to "to flatly contradict the express terms of the agreement." (*Consolidated World Investments, Inc. v Lido Preferred Ltd.*, *supra*, 9 Cal.App.4th at p. 379.) Further, the agreement must be reasonably susceptible to the proffered meaning. (*Founding Members*, *supra*, 109 Cal.App.4th at p. 955.) "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643.)

Shah points to the following language in recital F: "The inducement . . . [to Vineyard] shall come from the following funds . . . [a] new $3,000,000 loan to [Tuscany] from El Paseo Bank secured by collateral owned and guaranteed by [Shah]." He argues this language is subject to no interpretation other than that Tuscany would be the borrower and Shah would act only as guarantor. But as plaintiffs point out, this ignores the following language in paragraph 6: "However, [Oliphant], [Shah] and [Tuscany] agree that [Tuscany] shall be one hundred percent . . . liable and the primary Guarantor with borrower(s), etc, et al., for repayment of loan obligations of [Tuscany], on the real property to be conveyed by Vineyard . . . and for secured or unsecured lines of credit on any and all property of [Shah] and/or the Shah Family Trust securing [Tuscany] assets. It is acknowledged that the Lines of Credit and new loans will be the obligations of [Tuscany]."

If no other "borrower(s), etc." besides Tuscany itself were contemplated by the parties, there was no need to include language stating that Tuscany carried the

10

primary liability. This would be obvious; if Tuscany were the only borrower, then no language regarding its liability is necessary. "An interpretation rendering contract language nugatory or inoperative is disfavored. [Citation.]" (*Founding Members*, *supra*, 109 Cal.App.4th at p. 957.)

Thus, we are faced with an ambiguous contract including two important clauses that require further interpretation. We find the court did not err in admitting all relevant extrinsic evidence the parties wished to offer on to explain the first amendment's meaning. As we are not being asked to decide whether substantial evidence supported the meaning the jury reached, we need proceed no further on this point.

Defendants also argue parol evidence should not have been admissible to support plaintiffs' negligent misrepresentation claim, but we reject that argument for the same reasons. Because the first amendment was only partially integrated, we need not consider the applicability of the fraud exception.

*Credibility Evidence*

Defendants argue the court erred by allowing evidence of prior bad acts to attack Shah's credibility, necessitating a new trial. This evidence related to the status of Shah's medical license. He was a medical doctor (and is sometimes referred to by "Dr. Shah" in exhibits and testimony) until his license was revoked by the California Medical Board (CMB). He sought to have his license reinstated in 2008, but was unsuccessful. In another matter (the *Salhotra* case), Shah gave a deposition in which he stated the CMB's description and the reasons for revoking his license were correct. One such reason was Shah's lack of integrity and failure to tell the truth.

During his deposition in this matter, Shah was asked about his medical license. Defense counsel was unaware of Shah's testimony in the *Salhotra* case at the time. When asked whether he had sought reinstatement of his license, he testified it

11

would be coming up for reinstatement in 2011. When asked why his license had been revoked, Shah testified: "There were three different things: One was sex with a patient; second, was giving too much narcotics to a patient; and the third one was using the same medical record from the office to the hospital." He did not mention lack of integrity or failure to tell the truth, or that he had previously tried, and failed, to have his license reinstated.

Prior to trial, defendants sought to exclude any reference to CMB's decision pursuant to Evidence Code section 787. He also argued the evidence should be excluded under Evidence Code section 352. Plaintiffs opposed, arguing Evidence Code section 787 did not preclude the evidence's admissibility because it was being offered to demonstrate that Shah had lied during this case, and was therefore proper impeachment testimony under Evidence Code section 1101, subdivision (c). After considering the matter, the trial court decided the evidence was admissible for impeachment purposes on the issue of credibility, and any prejudice was outweighed by the evidence's probative value.

"Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion. [Citation.]" (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) Defendants argue the court abused its discretion by admitting the evidence despite Evidence Code section 787. (They do not appeal based on Evidence Code section 352.) When a party asserts evidentiary error, its "burden is to demonstrate the court's 'discretion was so abused that it resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*Hernandez v. Paicius* (2003) 109 Cal.App.4th 452, 456, overruled on other grounds in *People v. Freeman* (2010) 47 Cal.4th 993, 1006-1007, fn.4.)

Several Evidence Code sections are relevant here. Unless otherwise provided by statute, Evidence Code section 780 states: "the court or jury may consider in

determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including but not limited to . . . [¶] . . . [¶] (e) His character for honesty or veracity or their opposites. [¶] . . . [¶] (i) The existence or nonexistence of any fact testified to by him [¶] . . . [¶] (k) His admission of untruthfulness."

Evidence Code section 786 prohibits evidence of "traits" of character other than honesty or veracity, or their opposites, to attack or support the credibility of a witness. Evidence Code section 787 states "evidence of specific instances of his conduct relevant *only* as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness." (Italics added.) But under Evidence Code section 1101, subdivision (c), "evidence offered to support or attack the credibility of a witness" is admissible.

Contrary to defendants' argument, Evidence Code section 787 does not, preclude evidence of specific incidents to contradict direct testimony of a witness — for example, to show the witness lied about the facts on the stand. (*People v. Moses* (1972) 24 Cal.App.3d 384, 396-397.)

In *People v. Moses*, the court considered the admissibility of testimony by a police officer, Smith, in an undercover narcotics program. The identity of the defendant was a key issue. The defense contended the trial court erred by not permitting extrinsic evidence to impeach Smith's sincerity. "[W]e proceed from the premise that defendant wanted to provide a basis for the jury to find that Smith was advertently lying when he told the Pomona officers that the photograph he selected depicted the man he had dealt with in the bar and when he told the jury that defendant, as he stood in the courtroom, was that man (i.e., deliberately made a false identification) by: [¶] (a) showing (through evidence of contrary circumstances) that Smith had lied in court when he said to the jury that he had never made any misidentifications and that Smith would have been lying to

the jury if, being allowed to answer the second question, he had said that he had never misreported a quantity of contraband; and [¶] (b) showing that Smith lied in his report to Pomona officers when he said that he had made a buy from John Doe #1 at a certain time (by proving that at that same time he (Smith) was turning over evidence from another buy to superior officers)." (*People v. Moses*, *supra*, 24 Cal.App.3d at p. 394.)

The court concluded: "The difference between these two situations is that in the first one the asserted lie is in court and in the second, out of court. [Recent caselaw] suggests that (1) proof of the former is allowable, but excludable under a fair exercise of discretion pursuant to Evidence Code section 352; but that (2) proof of the latter is impermissible." (*People v. Moses*, *supra*, 24 Cal.App.3d at p. 394.) Thus, a lie offered under oath in the current proceeding is admissible, whereas an out of court statement, even one in an official report, was not.

As the court explained: "'Section 780 of the Evidence Code provides that, except as otherwise provided by statute, the court or jury in assessing the witness' credibility may consider "*any* matter that has any tendency in reason to prove or disprove the truthfulness of [the witness'] testimony . . . ." That section sets forth "a convenient list of the most common factors that bear on the question of credibility." [Citation.] Among those matters which the jury or judge may consider is the "existence or nonexistence" of *any* fact testified to by the witness. [Citation.] The nonexistence of a fact testified to is relevant insofar as it is an indication of the witness' general truthfulness and credibility on the witness stand. For this reason juries are instructed, as was the jury in this case, that a witness willfully false in one part of his testimony is not to be trusted in others.' [Citation.] Thus, we understand, a jury may consider, as a matter tending in reason to show the untruthfulness of a witness' testimony, '[t]he nonexistence of a fact testified to' by him, even though the subject matter is collateral and the purpose is to show that the witness is a person prone to mendacity and therefore likely to be lying as to

14

matters directly in issue (see § 787).'"  (*People v. Moses*, *supra*, 24 Cal.App.3d at p. 396; see also *People v. Lavergne* (1971) 4 Cal.3d 735, 742.)

"The [California] Supreme Court, therefore, despite the introductory provisional phrase of section 780 does not believe that section 787 prevents showing that a witness on the stand lied about a specific instance of conduct by establishing what that conduct really was, even though the result of the combination of the false statement in court and the extrinsic proof of the circumstance involved tends to prove the trait of character of propensity to prevaricate."  (*People v. Moses*, *supra*, 24 Cal.App.3d at pp. 396-397, fns. omitted.)

Had plaintiffs tried to raise Shah's problems with the CMB for the first time at trial, or if Shah had told the truth about these matters during his deposition, we would agree with defendants that this evidence would be inadmissible under Evidence Code section 787.  The key difference here is that Shah lied under oath *during these proceedings*.  Thus, the evidence of Shah's conduct was not admitted "*only* as tending to prove a trait of his character . . . ."  (Evid. Code, § 787, italics added.)  It was admitted to show that he lied during these proceedings.

Deposition testimony is admissible at trial against any party for the purpose of impeaching the testimony of the deponent.  (See Code Civ. Proc., § 2025.620, subd. (a).)  It is the functional equivalent of testimony at trial.  As juries are often instructed, "You must consider the deposition testimony that was presented to you in the same way as you consider testimony given in court."  (CACI No. 208.)  Had Shah lied under oath on the witness stand in this case, his testimony would have been immediately impeachable.  The result is no different because he gave the false testimony during a deposition.  Shah made his own bed by choosing to lie under oath in this case.  The court did not err by admitting evidence that he did so.  Accordingly, a new trial on this ground was not warranted.

*Adequacy of Special Verdict Form*

Defendants next argue the special verdict form was ambiguous because the term "and/or" was used to describe Oliphant and Matzner on one hand, and Shah and the Shah Family Trust on the other. The court's intent in using this language was to avoid a lengthy verdict form that would require the jury to resolve the same issues five separate times, once for each party. Taken together, as given, the special verdict form on the complaint and cross-complaint was nine pages long. We review this issue de novo. (*Taylor v. Nabors Drilling, USA, LP* (2014) 222 Cal.App.4th 1228, 1242.)

We conclude that given the context of the facts of this trial, the verdict form was not ambiguous. An ambiguity only arises if the parties (Oliphant, Matzner, and Tuscany on plaintiffs' side and Shah and the Shah Family Trust on the other) were not agents of each other. Defendants refused to stipulate to this, but offered no evidence to the contrary at trial. Defendants argue that Matzner might not have reasonably relied on Shah's representations, but this is irrelevant if he, Oliphant and Tuscany were each other's agents. Similarly, defendants claim the issue at trial was *not* whether Shah had authority to act on behalf of the trust, but whether he actually acted as the trustee when agreeing to borrow money from El Paseo. But again, the fundamental existence of an agency relationship was not in dispute.

The jury was also instructed on agency, and the parties could be found responsible for each other's actions if acting as agents. They were also instructed on damages that they must determine the liability of each defendant to plaintiffs separately, and they must not divide the damages between the defendants. Thus, in light of the pleadings and the evidence, we conclude there was no ambiguity in the special verdict form. Absent some indication in the record, we presume the jury followed the court's instructions and that its verdict reflects the limitations the instructions imposed. (*Cassim*

16

*v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804; *People v. Bradford* (1997) 15 Cal.4th 1229, 1337.) A new trial on this ground is unwarranted.

*Implied Contractual Indemnity*

Defendants also argue the court's finding on the implied contractual indemnity claim cannot be upheld. They argue the statement of decision did not make any findings necessary to support a verdict for plaintiffs, and such findings cannot be implied because the omission in the statement of decision was brought to the court's attention.

Defendants state the process to obtain a statement of decision "was somewhat confused." Before hearing the equitable claim, the court asked each party to submit a proposed statement of decision, both of which requested judgment in their favor on the claims for implied contractual indemnity. The court issued a tentative statement of decision, which stated: "The Court finds that the Defendants are estopped from asserting an interpretation of the First Amendment to the Operating Agreement . . . which would not require Suresh Shah acting as the Managing Member of Tuscany . . . to perform in the best interests of all the members of Tuscany . . . and to obtain the $3000000 loan from El Paseo Bank . . . pursuant to the executed Purchase and Sale Agreement . . . . It would be unfair and unreasonable for the Court to accept the assertion that Defendants were required to obtain the loan from El Paseo Bank if and only if it was directly to Tuscany . . . as the borrower."

The tentative also states defendants were aware of the circumstances of the El Paseo loan on a continuing basis from December 24, 2008 forward, that Shah's refusal to sign breached his representations that he would obtain and guarantee the necessary financing, that defendants never denied that the borrower could either be Shah or the family trust, and that defendants failure to complete the transaction resulted in

17

foreseeable consequences to plaintiffs, who detrimentally relied on the promises to perform.

Defendants then requested a statement of decision, or alternatively, offered objections to the tentative. One of the requested findings for the statement of decision was "[w]hether Plaintiffs have satisfied the elements of implied equitable indemnity, and if so, the legal and factual basis for the finding that they have." The objections stated the tentative "omits any discussion of whether Plaintiffs have satisfied the elements of implied equitable indemnity . . . ." As far as we can tell, there was no effort to correct the tentative.

Plaintiffs do not argue the statement of decision clearly addressed the subject of implied contractual indemnity.[3] They do argue defendants failed to timely request a statement of decision or object to it. We disagree. The tentative was filed on August 14, 2012. Defendants filed their request for statement of decision and objections on September 12. The proposed judgment was filed on September 18.

California Rules of Court, rule 3.1590(d) requires a statement of decision to be requested within 10 days of the date of the tentative. But even if we assume the pre-filed proposed statements of decision did not act as a sufficient request, objections to a proposed statement of decision are not required to be filed until 15 days after both the proposed statement of decision and judgment are served. (Cal. Rules of Court, rule 3.1590(g).) The proposed judgment was not filed until after defendants filed their request for a statement of decision and objections. Thus, even if the request for the statement of

---

[3] The doctrine of implied contractual indemnity has its roots in equity. Such indemnity is "available when two parties in a contractual relationship were both responsible for injuring a third party; recovery rested on the theory that 'a contract under which the indemnitor undertook to do work or perform services necessarily implied an obligation to do the work involved in a proper manner and to discharge foreseeable damages resulting from improper performance *absent any participation by the indemnitee in the wrongful act precluding recovery.*' [Citations.]" (*Prince v. Pacific Gas & Electric Co.* (2009) 45 Cal.4th 1151, 1159.)

18

decision was untimely (which we question), the nearly identical objections to the tentative were timely filed.

We also agree with defendants that both the request for a statement of decision and the objections were sufficient to bring the deficiencies in the tentative to the court's attention. "A statement of decision explains the factual and legal bases for the trial court's decision in a nonjury trial. [Citation.] If the statement of decision fails to decide a controverted issue or is ambiguous, any party may bring the omission or ambiguity to the trial court's attention either before the entry of judgment or in conjunction with a new trial motion or a motion to vacate the judgment under Code of Civil Procedure section 663. [Citation.] If an omission or ambiguity is brought to the trial court's attention, the reviewing court will not infer findings or resolve an ambiguity in favor of the prevailing party on that issue. [Citation.]" (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 896, fn. omitted.) "To bring an omission or ambiguity to the trial court's attention for purposes of Code of Civil Procedure section 634, a party must identify the defect with sufficient particularity to allow the court to correct the defect. [Citation.]" (*Ibid.*) Here, identifying the lack of any specificity in the tentative about the implied contractual indemnity cause of action was more than sufficient. We therefore cannot imply findings to support the court's conclusion on the equitable claim, and we must reverse the judgment on this point. (*Social Service Union v. County of Monterey* (1989) 208 Cal.App.3d 676, 681.) While defendants claim we can find in their favor as a matter of law, we believe it is ill-advised to do so without even learning the court's reasons for its decision.

Moreover, we note this is not a per se reversal. The lack of an adequate statement of decision hampers any efforts for this court to resolve the substantive issues defendants raise. Defendants claim a lack of substantial evidence that Shah's "failure to complete the transaction with El Paseo Bank caused harm to Vineyard Bank or any third

19

party" or that plaintiffs "were held liable or required to pay any damages." We cannot tell what damages the court was awarding or for what reason. Plaintiffs requested $1,458,586 in actual damages on both the equitable and legal claims; the jury awarded $858,506. The court increased the total award to $1,208,566 on the equitable claim, an increase of $350,060. Plaintiffs argue the increase is due to Tuscany's presence as a plaintiff on the equitable claim, but as defendants point out, it is unclear what damages Tuscany suffered that were not also suffered by Oliphant and Matzner, or how those damages were properly awarded in the context of indemnifying plaintiffs for losses suffered by a third party.

On remand, the parties must bear in mind that a claim for implied contractual indemnification is, at its heart, an *indemnification* claim. Damages must therefore be tied to amounts that plaintiffs were required to pay third parties. It is not appropriate to award all damages proximately caused as a result of the breach; doing so destroys any distinction between an implied contractual indemnity claim and a legal claim for breach of contract. Perhaps the court's judgment intended to only award damages based on a finding that defendants must indemnify plaintiffs for losses to third parties, but based on the current statement of decision, we simply cannot tell. Therefore, this claim must be reversed and remanded for further proceedings. The trial court is directed to prepare a statement of decision explaining the factual and legal bases for its decision to decide in plaintiffs' favor on the equitable claim and how the damages were computed. (*Espinoza v Calva* (2008) 169 Cal.App.4th 1393, 1398)

Due to our conclusion that reversal is required, we need not further address defendants' claim that the amount of damages on the equitable claim should not have exceeded the amount of damages on the legal claim.

20

*Attorney Fees*

Defendants argue that when the rest of the judgment fails, the attorney fee award must also fail. As reflected above, we have a mixed decision here, with an affirmance in plaintiffs' favor on the legal claims and a reversal and remand on the equitable claim. Accordingly, we direct the trial court to reconsider the attorney fee award in light of its actions on remand.

*Prejudgment Interest*

Plaintiffs' cross-appeal on the issue of whether they should have been awarded prejudgment interest. The trial court reserved this issue for itself before the jury began deliberating. The court's tentative decision on the equitable issues awarded "pre-judgment interest to be determined." After briefing by both parties, the trial court denied plaintiffs' motion for prejudgment interest on the grounds that the amount of damage was not certain or capable of being made certain as required by Civil Code section 3287, subdivision (a). Plaintiffs contend they are either entitled to interest under section 3287, subdivision (a), or as a discretionary matter under section 3287, subdivision (b).

Civil Code section 3287, subdivision (a) states: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt."

Prejudgment interest "is generally denied 'because of the general equitable principle that a person *who does not know what sum is owed* cannot be in default for failure to pay. [Citation.]' [Citation.]" (*Lucky United Properties Investments, Inc. v. Lee* (2013) 213 Cal.App.4th 635, 652-653.) The statutory exception applies only when damages are "certain, or capable of being made certain . . . ." (§ 3287, subd. (a).)

21

Essentially, prejudgment interest is only available when "'there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage.' [Citation.]" (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958.) The test is whether "*defendant* actually know[s] the amount owed or from reasonably available information could the defendant have computed that amount." (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.* (1983) 149 Cal.App.3d 901, 907, 911.)

Here, plaintiffs argue there was no dispute about the amounts Oliphant testified to at trial as out-of-pocket expenses. A spreadsheet summary was offered by plaintiffs at trial, and this was the only evidence of damages. Therefore, they argue, the amount of damages were undisputed.

Defendants counter that plaintiffs' claimed amount of damages changed numerous times during the pendency of the case. The complaint sought damages "according to proof" to be determined at trial. The complaint alleged defendants exposed plaintiffs to $10 million in liability to Vineyard "as well as continuing expenses, costs, and attorney's fees." Thereafter, plaintiffs sent defendants a summary of damages report estimating approximately $2,085,295.51. Later, plaintiffs revised their summary to approximately $1.5 million. During trial, plaintiffs first asserted damages of $1,489,121.24, which they later changed to $1,458,586.24. The second calculation was the total sought on both the legal and equitable claims. Neither the court nor the jury awarded either of these amounts.

Given this uncertainty, we disagree with plaintiffs that the amount the summary of damages they presented at trial was the final word on the matter. As a threshold matter, the amount of damages was contested at trial after liability was determined.

22

Moreover, the propriety of prejudgment interest does not simply depend on the evidence presented at trial, but the defendant's actual knowledge. (*Chesapeake Industries, Inc. v. Togova Enterprises, Inc.*, *supra*, 149 Cal.App.3d at pp. 907, 911.) The ever-changing amounts of damages claimed by plaintiffs do not lend itself to such certainty. Plaintiffs claim defendants could easily have computed the damages due, but given that they could not do so on a consistent basis, we find it unreasonable to expect defendants to do the same. The fact that plaintiffs finally figured out what they wanted to claim as damages by the time the trial date arrived does not mean that damages were readily calculable all along. This is not a mere discrepancy between the pleadings and the judgment, as plaintiffs suggest; it reflects a genuine confusion as to the amount plaintiffs claimed they had lost. We therefore conclude the trial court did not err by finding prejudgment interest was not appropriate under Civil Code section 3287, subdivision (a).

Plaintiffs' initial brief on the cross-appeal also offered a two-paragraph argument contending they were entitled to prejudgment interest as a discretionary matter under Civil Code section 3287, subdivision (b). We agree with defendants that this argument was poorly developed and therefore waiver of the issue is appropriate on that basis alone.[4] (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

In addition, however, these grounds were not included in plaintiffs' moving papers in the trial court. While plaintiffs' reply brief admits this is a discretionary doctrine, they also argue we can decide it as "a question of law based on facts established in the record." Plaintiffs are incorrect. The question of law exception does not apply where we are reviewing a court's ruling for abuse of discretion, which is exactly the case here. (*Gonzalez v. County of Los Angeles* (2004) 122 Cal.App.4th 1124, 1131-1132.)

---

[4] Plaintiffs' expanded argument in its reply brief is not sufficient to save the issue from waiver. Absent a showing of good cause, we need not consider issues raised for the first time in a reply brief. (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 108.)

Plaintiffs' statement of the issue is whether "the court [should] have exercised its discretion to award prejudgment interest from the date the cross-complaint was filed?" It is not our role to put ourselves in the trial court's shoes on a wholly discretionary matter that was never raised below. Plaintiffs have waived this issue.

## III

## DISPOSITION

The jury's verdict on the legal causes of action is affirmed. The court's verdict on the equitable claim is reversed and remanded with instructions for the trial court to prepare a new statement of decision. The attorney fee award is also reversed for the trial court to reconsider based on its decisions on remand. Each party shall bear its own costs on appeal.


MOORE, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.